[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1199 
 I. Procedural History
Roger Dale Lolley ("the worker") worked as an industrial painter for Edmonds *Page 1200 
Industrial Coatings, Inc. ("the company"). The worker, who had worked primarily as an industrial painter and sandblaster since 1963, had worked for the company from 1975 to 1978 and began working for the company again in May 1994. Shortly after he resumed working for the company, the worker had a skin reaction and began having difficulty breathing when exposed to paint fumes and other industrial solvents used in his profession. For ease of reading, we will hereinafter refer to all potential aggravating fumes and solvents the worker could have been exposed to during his employment as "paint fumes." According to the worker, he continued to experience these symptoms between June 1994 and July 1995. In late July 1995, the worker underwent emergency quadruple bypass surgery. He returned to work only briefly, in October 1995, as a safety man, but he determined that he could not perform that job because of his shortness of breath and the exertion required.
On March 1, 1996, the worker sued the company, seeking workers' compensation benefits. The company answered the complaint; it was defended by counsel retained by American Interstate Insurance Company ("American Interstate"), its workers' compensation insurance carrier from August 1995 to August 1996. After deposing the worker in June 1996, the company brought a third-party complaint against Cigna Property and Casualty Insurance Company, which is now known as Insurance Company of North America ("INA"), which was the company's workers' compensation insurance carrier from August 1993 to August 1994, and Wausau Insurance Company ("Wausau"), which was the company's workers' compensation insurance carrier from August 1994 to August 1995.[1] In that third-party complaint, the company alleged that the worker had not been exposed to paint fumes during October 1995 and that his exposure to the hazards of his employment resulting in the development or aggravation of his alleged occupational disease occurred either during INA's or Wausau's coverage periods.
After a trial, the trial court determined that the worker was permanently and totally disabled and awarded benefits accordingly. The trial court did not rule on the third-party complaint, and it did not certify the judgment as final pursuant to Rule 54(b), Ala. R. Civ. P. The company appealed that judgment in August 2002. This court dismissed the appeal as being from a nonfinal judgment. See Edmonds Indus. Coatings, Inc. v. Lolley,863 So.2d 1121 (Ala.Civ.App. 2003).[2] The trial court, in May 2003, entered a Rule 54(b) certification, rendering its earlier judgment a final appealable judgment. The company appealed again, arguing that the worker failed to meet his burden of proof regarding causation of an occupational disease, that the evidence was not sufficient to support a finding of permanent and total disability, and that the worker failed to give notice of his occupational disease to the company. That appeal was assigned case number 2020861. *Page 1201 
In July 2003, the trial court entered a judgment dismissing the third-party complaint against INA and Wausau. That judgment reiterated the trial court's earlier finding that the worker's last date of exposure to the hazards of his employment, i.e., paint fumes, was October 12, 1995. The company appealed this judgment in November 2003, arguing that the trial court had erred in awarding compensation to the worker in the underlying worker's compensation judgment and that the trial court had incorrectly determined the worker's last date of exposure. That appeal was assigned case number 2030212.
The company moved to have both appeals consolidated. Because no other party objected and because the cases are closely related, we consolidated the appeals for decision.
 II. Standard of Review
Our review of this case is governed by the Workers' Compensation Act, which states in pertinent part: "In reviewing pure findings of fact, the finding of the circuit court shall not be reversed if that finding is supported by substantial evidence." Ala. Code 1975, § 25-5-81(e)(2). Therefore, this court "will view the facts in the light most favorable to the findings of the trial court." Whitsett v. BAMSI, Inc., 652 So.2d 287,290 (Ala.Civ.App. 1994), overruled on other grounds, Ex parteTrinity Indus., Inc., 680 So.2d 262, 269 (Ala. 1996). Further, the trial court's finding of fact is supported by substantial evidence if it is "supported by `evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.'" Ex parte Trinity Indus., 680 So.2d at 269 (quotingWest v. Founders Life Assurance Co. of Florida, 547 So.2d 870,871 (Ala. 1989), and citing Ala. Code 1975, § 12-21-12(d)). Our review of legal issues is without a presumption of correctness. Ala. Code 1975, § 25-5-81(e)(1); see also Ex parte TrinityIndus., 680 So.2d at 268.
 III. Occupational-Disease Standard
The worker sought and received compensation for an occupational disease caused or aggravated by his employment with the company.
 "Section 25-5-110, [Ala.] Code 1975, provides the conditions for recovery under the work[ers]' compensation law for an occupational disease. To be occupational, the disease must be due to hazards which are (1) in excess of those ordinarily incident to employment in general and (2) different in character from those found in the general run of occupations. James River Corp. v. Mays, 572 So.2d 469 (Ala.Civ.App. 1990).
 "The fact that an employee had a preexisting condition does not affect an award of compensation if the job combined with the preexisting condition to produce injury or death. James River Corp. [, 572 So.2d at 472].
 "To recover benefits under this view, the claimant must prove causation or aggravation of an existing condition. An occupational disease is not compensable if it is not caused or aggravated by the nature of the employment. Ex parte Cash, 624 So.2d 576 (Ala. 1993); James River Corp. [, 572 So.2d at 472]."
Courtaulds Fibers, Inc. v. Finley, 644 So.2d 5, 7 (Ala.Civ.App. 1994).
 IV. Facts
Shortly after the worker began working for the company in May 1994, he was painting in a turbine room when he had a severe skin reaction. According to the worker, he swelled up and developed an itchy rash. On June 2, 1994, the worker saw Dr. Keith Aldridge, who opined in his deposition that the worker was not suffering *Page 1202 
from contact dermatitis caused by contact with an agent that irritates the skin but that the worker instead appeared to have a case of folliculitis, which is an infection of the hair follicles. Dr. Aldridge prescribed a steroid injection, an antibiotic, and a pill to control the worker's itching. Dr. Aldridge's office notes did not reflect, nor did Dr. Aldridge independently recall, that the worker made any complaints about his lungs or breathing on that date.
According to Dr. Katherine Hensleigh's deposition, the worker saw her on June 15, 1994, complaining of cold- or flu-like symptoms, hoarseness, and a rash on his arms and neck. Dr. Hensleigh noted that her records reflected that she performed an examination of the worker, which revealed that the worker had a slightly red throat, nasal congestion, wheezing, and "a lot of bronchi." She also testified that the worker had a rash on his arms that she diagnosed as atopic dermatitis. When questioned regarding Dr. Aldridge's opinion that the rash was folliculitis, or a bacterial infection of the hair follicles, Dr. Hensleigh stated that folliculitis was caused by different things, including bacterial infections or autoimmune reactions.
Dr. Hensleigh testified that she x-rayed the worker's lungs; that lung X-ray revealed a mass with an infiltrate in the right lower lung and a possible mass effect in the left lung. Dr. Hensleigh testified that she was at first concerned that the worker, who was a smoker, might have lung cancer. Although she said that she had recommended that the worker undergo further lung studies by a pulmonary specialist, she said that the worker refused to follow her advice. Dr. Hensleigh said that her office notes indicate that she next saw the worker again in August 1995, when he complained of increased wheezing when exposed to noxious fumes. She did testify, however, that, at times, the worker and other patients would see only her nurse-practitioner for a refill of a prescription and that those "visits" would not be reflected in her office notes.
According to Dr. Hensleigh's deposition testimony, the worker suffered from chronic obstructive pulmonary disease ("COPD"), the cause of which she opined was "multifactorial," including both his history of smoking and his long-term exposure to paint fumes. She testified that long-term exposure to paint fumes could possibly cause COPD. Although Dr. Hensleigh testified that she felt no one could determine for certain if the worker's exposure to paint fumes over his lifetime was a contributing cause of his COPD, she stated that exposure to the fumes would aggravate the disease and could cause further scarring and damage to the lungs. She further testified that she found the worker's complaints to be consistent with what she termed "reactive asthma." The worker's wheezing, according to Dr. Hensleigh, occurred as an allergic asthmatic reaction to his exposure to paint fumes. Such reactions, according to her testimony, can be severe. She said that, in August 1995, she advised the worker to quit smoking, to avoid irritants including paint fumes, and to leave his job for the benefit of his health.
Dr. Hensleigh had aided the worker in receiving Social Security disability benefits on the basis of the combination of his COPD and his coronary artery disease. She testified that she had restricted the worker to sedentary work based on the combination of his COPD and his coronary artery disease. When questioned specifically concerning whether she could determine the level of the worker's disability based only upon his COPD and not his coronary artery disease, she answered that she could not. *Page 1203 
The worker was seen by Dr. Mohammed Nayeem in March 1996, in connection with a Social Security disability claim. Dr. Nayeem diagnosed the worker with COPD. He commented that the disease would not keep the worker from carrying on normal daily activities but that it would prevent him from performing any sustained physical activity.
Dr. Kent Darsey examined the worker on September 16, 1996. Dr. Darsey testified that his office notes reflected that the worker's complaints centered on itching and continual rashes that the worker said were a result of "paint in his bloodstream" and recurrent pneumonia or bronchitis the worker said were induced by inhaling chemical fumes like paint fumes. Dr. Darsey said that he had determined that the worker's rashes were not caused by contact with or inhalation of a chemical. Dr. Darsey also noted in his deposition that the worker's chest X-rays looked good for a smoker and that he had no acute active pulmonary disease. Dr. Darsey testified that the worker's pulmonary-study results indicated that he suffered from both obstructive and restrictive lung disease and emphysema. Dr. Darsey stated that recurrent chemical pneumonitis, pneumonia caused by inhalation of a chemical, could cause COPD, but he did not think that the worker's COPD was caused by recurrent chemical pneumonitis because of the lack of scarring on the worker's lung X-rays. Although Dr. Darsey testified that he could not rule out long-term exposure to paint fumes as a contributing cause of the worker's COPD, he said that he would rank smoking "higher on the list" of factors. According to Dr. Darsey, the worker's COPD would be aggravated by exposure to paint fumes.
Dr. Fred Duggan, a board-certified pulmonologist appointed by the court, examined the worker in February 1999. He said that he found the worker's pulmonary functions to be basically normal. He testified that long-term exposure to paint fumes could possibly have aggravated the worker's underlying disease process. He also stated that exposure to paint fumes and other irritants would cause the worker to suffer symptoms that would relieve once the worker was away from the irritant. Dr. Duggan further testified that the worker reported that his shortness of breath worsened after his bypass surgery, which Dr. Duggan felt was quite possible, because, according to Dr. Duggan, bypass surgery can profoundly affect a limitation existing before the surgery because the surgery alters the chest wall. When asked if the worker's shortness of breath was related more to his bypass surgery or to his pulmonary disease, Dr. Duggan stated, "I don't think there is any way to separate the contribution of each factor."
At trial, the worker testified that he had worked in the painting and sandblasting industry for nearly his entire adult life. He denied having any breathing or lung problems before June 1994. The worker said that he began experiencing symptoms including running a fever, breaking out all over, and cold-and flu-like symptoms shortly after beginning to work for the company in May 1994. He described the feeling of his breathing problems as being like a "fire breathing dragon" and said that the rashes were so bad that he would have to take what he referred to as "scalding" baths to ease the itch. He said that his reaction to paint fumes was immediate but that the full effects of his shortness of breath and coughing would last approximately one and one-half to two hours after the initial exposure.
The worker testified that his supervisor, Bobby Lassiter, noticed the worker's rash in May 1994. At the time the rash occurred, the worker was painting in the *Page 1204 
turbine room, a room in which temperatures can reach 127 degrees. According to the worker, Lassiter called Charles Edmonds over to see the worker's rash, and Lassiter and Edmonds decided that the worker should be transferred out of the turbine room to a cleaning crew in the yard to lessen his exposure to paint fumes. The worker testified that he was still exposed to paint fumes once assigned to the cleaning crew, because, he said, painters would be about 15 feet away. He did admit that the amount of exposure was lessened by his transfer.
After the worker recovered from his bypass surgery, he attempted to return to work as a safety man. His job was primarily to walk around the work area and to notice whether the other workers were obeying safety rules. He testified that he was still exposed to paint fumes and experienced breathing problems during the five to seven days he worked as a safety man. The worker also said that his shortness of breath coupled with the exertion required by the job was too much for him, so the worker decided he could no longer work. The worker explained that he did wear a respirator, but he said that paint fumes could penetrate the respirator. He said that his breathing problems worsened in the months between his first report of them in June 1994 and July 1995, when he had his bypass surgery. When questioned about why Dr. Hensleigh's records had not indicated that he had seen her during that time, the worker said he thought that he had seen her during that year. The worker also testified that he had paid for his doctor visits; he said the company had not paid for any doctor visits or medication.
The worker testified that his breathing problems would get better when he was away from work, such as over a weekend, but that they never fully subsided. He complained that he was often hoarse, that he had bouts of bronchitis, that he had a persistent cough, and that he suffered asthma-like symptoms periodically when exposed to an irritant. As an example, the worker explained that he had to leave the house when his former wife would paint her nails. He also said that he was unable to continue to work because he could not breathe; he said that he could not "do much of anything," that he required frequent rest periods, and that he was confined to the house to avoid irritants like pollen and dust approximately 15 days out of each month.
In addition to his trial testimony, the worker gave two depositions, which were used extensively by the company during cross-examination at trial. Some of the worker's trial testimony conflicted with the testimony in his depositions. The most striking contradiction involves the worker's testimony in his first deposition, taken in June 1996, that he was not around paint fumes when he worked for the company in October 1995. In contrast, the worker's March 1997 deposition and trial testimony was that he was exposed to paint fumes in October 1995 as he would walk around paint crews. The worker's June 1996 deposition testimony concerning his reason for leaving the company in October 1995 was that he was not able to handle the exertion the job required. In his March 1997 deposition, the worker said that his heart gave him some trouble but that the primary basis for his decision to quit work was that he could not breathe. At trial, the worker testified that both the exertion required and his shortness of breath resulted in his decision that he could no longer work.
Five of the workers' coworkers or supervisors testified, including Lassiter, Charles Edmonds, and Jimmy Edmonds, the president of the company. Their testimony, collectively, indicated that the worker had *Page 1205 
not complained to them of having breathing problems at all. In addition, their collective testimony indicated that the respirators used by the company were very effective, unless, according to Lassiter, the respirator was used in a confined space, when not all the fumes could be kept out.
Bill Vinson, a vocational-rehabilitation consultant, testified that the worker was 100% vocationally disabled. Vinson testified that he based his conclusion on an interview with the worker, testing, and reviews of the worker's medical records and doctor's depositions. The worker, who was 56 years old at the time of trial, had completed the 11th grade. According to Vinson's testing, the worker's scores on the Wide Range Achievement Test indicated that he read and performed math at a seventh-grade level and that he spelled on a sixth-grade level. Vinson testified that the worker's marginal to limited educational status would impact his ability to change careers. He said that most people with an educational status like the worker's would be limited to performing semi-skilled work involving manual labor.
Vinson said that he based his opinion, in large part, on Dr. Hensleigh's restrictions, which limited the worker to sedentary work based on both his COPD and his coronary artery disease. He also determined the worker would be unemployable based on the worker's statements that he needed frequent rest periods and that he was frequently restricted to his house. These facts, said Vinson, would prevent the worker from maintaining employment. In addition, Vinson cited the worker's advanced age, his lack of transferable skills, and the high unemployment rate in Choctaw County as factors impacting the worker's vocational disability. Vinson did opine that the restriction that the worker not work around paint fumes was sufficient, in this particular case, to lead to a determination that the worker was 100% vocationally disabled in light of the worker's relevant work history, lack of transferable skills, and age.
 V. Appeal from the Workers' Compensation Action
Although the company delineates five separate issues in the "Issue" section of its brief in support of its appeal of the judgment in favor of the worker, its "Argument" section is composed of a single, rambling argument touching on the issues but focusing primarily on the heart of the first two issues — that the worker failed to prove that his COPD was an occupational disease caused by exposure to paint fumes at work. The company argues that the testimony of the doctors reveals that exposure to paint fumes only temporarily irritated the worker's COPD and that the worker failed to meet, in its opinion, the "heavier burden" of causation set out by our supreme court in Ex parte Valdez,636 So.2d 401 (Ala. 1994). In conjunction with the primary causation arguments, the company argues that the worker failed to prove that exposure to paint fumes legally and medically caused a permanent and total disability. The company then argues that any paint fumes to which the worker was exposed in October 1995 were not enough to amount to injurious exposure under the standard set out in Dueitt v. Scott Paper Co., 695 So.2d 40 (Ala.Civ.App. 1996). Finally, the company argues that the worker failed to give proper notice of his occupational disease. We will address those arguments that are easier to resolve before discussing the company's major arguments concerning causation.
 A. The Notice Argument
The company's notice argument is easily resolved. As noted above, this argument is only briefly addressed in the company's brief, and the paragraph-long argument contains only a citation to Ala. *Page 1206 
Code 1975, § 25-5-78, which is located in Article 3 of Alabama's Workers' Compensation Act. The notice provision cited by the company states: "For purposes of this article only, an injured employee . . . shall give . . . written notice of the accident." § 25-5-78. The worker sought workers' compensation benefits under Article 4 of the Act, dealing with occupational diseases. Unlike Article 3, Article 4 does not have a notice provision. In fact, Ala. Code 1975, § 25-5-123, expressly provides that the notice provision contained in § 25-5-78 does not apply to Article 4. Accordingly, the company's notice argument fails.
 B. The "Last Injurious Exposure" or Dueitt Standard Argument
In addition, we cannot agree with the company's argument that the worker failed to present substantial evidence of "injurious exposure" under the Dueitt standard. Dueitt is a hearing-loss case. At issue in Dueitt was whether a worker claiming hearing loss as an occupational disease was barred by the statute of limitations from receiving workers' compensation benefits because his last workplace exposure to noise was not "sufficient both in intensity and duration to have the potential to cause damage to the employee's hearing." Dueitt, 695 So.2d at 44. The company makes no argument that the worker was barred from recovering workers' compensation benefits based on the statute of limitations, and the worker in the present case was not claiming benefits for hearing loss; thus, at first glance, Dueitt
appears completely inapposite to the present case.
If the company is arguing that the Dueitt standard applies in the present case to prevent the worker from receiving benefits because the worker could not have been exposed to sufficient paint fumes to cause COPD or to aggravate COPD (based on his use of a respirator or for any other reason), we are not convinced that Dueitt has any application here. The Dueitt court construed § 25-5-117(b), which states that the date of the injury in an occupational disease case other than those involving radiation exposure or pneumoconiosis is the "date of the last exposure to the hazards of the disease in the employment of the employer in whose employment the employee was last exposed to the hazards of the disease." As noted above, Dueitt was a case involving hearing loss. The sentence in the Dueitt opinion indicating that exposure must be sufficient in intensity and duration expressly states that a worker's exposure "tooccupational noise" must be "sufficient both in intensity and duration to have the potential to cause damage to the employee's hearing." Dueitt, 695 So.2d at 44 (emphasis added). The same sentence contains the phrase "in a hearing loss case." Id.
(emphasis added). This particular wording indicates that the holding in Dueitt is restricted to cases involving hearing loss. In any event, as the evidence in the present case indicated, and as the trial court found, the worker had an immediate and lasting reaction caused by his exposure to paint fumes. The worker's exposure to paint fumes, then, must have been sufficient in intensity and duration to produce a reaction.
 C. The Causation Arguments
The company's major arguments focus on whether the worker met his burden of proving that exposure to the paint fumes at his workplace caused or aggravated his COPD so as support the trial court's conclusion that the worker suffered from an occupational disease. Contained within this argument are the company's complaints that the worker's symptoms were only temporarily aggravated by exposure to paint fumes and other irritants, that the worker failed to prove a sufficient amount of exposure to meet the heavier causation burden imposed by Ex parte Valdez, and *Page 1207 
that the worker failed to present substantial evidence that his exposure to paint fumes resulted in permanent and total disability in light of his coronary artery disease and bypass surgery. A discussion of Ex parte Valdez and caselaw considering whether the aggravation of an existing disease amounts to an occupational disease under the Workers' Compensation Act is necessary to resolve these issues.
In Ex parte Valdez our supreme court considered whether a worker's surviving widow had proven that the worker's exposure to coal-tar epoxy was a contributing cause to the worker's lung cancer. The trial court had denied benefits, stating in its judgment that "`asbestos exposure and cigarette smoking alone could account for the [worker's] cancer and death'" and concluding that the worker's exposure to coal-tar epoxy "`did notdirectly or proximately cause his [disease or] death.'" Exparte Valdez, 636 So.2d at 403. The supreme court concluded that the trial court had used the wrong standard in evaluating the claim for compensation. Id. The test, the court stated, was "whether such exposure was a contributing cause of the [worker's] illness. . . ." Id.
In its discussion, the supreme court commented that a case involving a disease indigenous to the workplace, like byssinosis or pneumoconiosis, was substantially different from a case in which the worker was attempting to prove that occupational factors contributed to the development of a disease that occurs outside of a particular occupation, such as cancer. Id. at 403-04. In that respect, the court pointed out that workers attempting to prove that a disease not specifically linked to a particular occupation is an occupational disease will "bear a heavier burden of proof with respect to medical causation than" those attempting to prove the occupational-disease status of a disease like byssinosis or pneumoconiosis. Id. at 404. The court summed up the worker's burden in such a situation as follows: "Recovery . . . is dependent upon the [worker's] proof that the totality of the [worker's] work environment . . . contributed to cause his [disease]. . . ." Id.
The testimony concerning causation of the worker's COPD was certainly in conflict. The company may well be correct in arguing that the worker failed to present substantial evidence to support the trial court's factual determination that the worker's exposure to paint fumes was a contributing cause of his COPD. However, we need not determine whether the worker met the heavier burden imposed by Ex parte Valdez regarding the cause of his COPD, because the trial court also found that the worker proved that his exposure to paint fumes aggravated his COPD.
The record contains evidence supporting a conclusion that the worker's COPD, even if not caused by his work environment, was aggravated by it. A disease may be compensable as an occupational disease if it is aggravated by the nature of the employment. SeeEx parte Cash, 624 So.2d 576, 577 (Ala. 1993); Avondale Mills,Inc. v. Weldon, 680 So.2d 364, 366 (Ala.Civ.App. 1996);Courtaulds Fibers, 644 So.2d at 7; Dodson v. Atrax Div. ofWallace-Murray Corp., 437 So.2d 1294, 1297 (Ala.Civ.App. 1983); and Chrysler Corp. v. Henley, 400 So.2d 412, 415 (Ala.Civ.App. 1981). This court held in Dodson, for example, that an allergy that irritates a worker's already sensitized airways can be compensated as an occupational disease. Dodson, 437 So.2d at 1297-98. As noted above, the doctors all testified that the worker's COPD would be aggravated by his exposure to paint fumes and other irritants.
The company further argues that a temporary aggravation of symptoms will not *Page 1208 
support an award of benefits. In general, that statement is supported by caselaw stating that a "disease means more than a temporary disorder, . . . it denotes a serious disorder which has impaired the constitution or left in its wake some organic or chronic effect which has undermined the general health."Henley, 400 So.2d at 415. The company argues that the doctors all stated that the worker's reaction to irritants was a temporary aggravation that would resolve once the worker was away from the irritant. In addition, the company argues that most of the doctors testified that such temporary aggravations would not cause permanent damage to the worker's lungs. Thus, the company argues, the worker's condition was a temporary one that is not compensable.
This argument ignores the fact that every time the worker was exposed to paint fumes he suffered what Dr. Hensleigh described as allergic or reactive asthma symptoms. These symptoms may indeed have been temporary in that they resolved after a time once the worker was away from the fumes. However, the symptomatic episodes the worker faced when exposed to paint fumes or other irritants was not a temporary problem; they occurred upon every exposure. The worker's allergic or reactive asthma was permanent in that respect.
This case is very similar to Dodson, in which the worker was exposed to tungsten carbide during the course of her employment.Dodson, 437 So.2d at 1295. The worker suffered a bout of bronchitis, which, according to the testimony of one of the doctors that examined the worker, was caused by the worker's exposure to tungsten carbide. Id. at 1295. The same doctor testified that the worker's airways had been "sensitized" by her condition and that working around dust or fumes would cause the worker difficulty. Id. at 1296. Both of the doctors that examined the worker opined that the worker could not continue to work for the company or in similar environments. Id. at 1295-96.
At the time of trial, the worker in Dodson was no longer suffering from bronchitis, because she was no longer working for the company. Id. at 1297. However, the undisputed testimony revealed that the worker's "bronchitis sensitized her airways leaving her more susceptible to bronchitis and other obstructive airway diseases." Id. Because of her "remaining sensitivity and susceptibility," the court reversed the trial court's denial of benefits, concluding that the worker suffered from a compensable occupational disease. Id. The court based this conclusion on its determination that the worker in Dodson was "left . . . with an earning impairment," stating, "[i]n other words, she has an `allergy' which prohibits her from working at Atrax, or any similar industrial environment." Id. This "residual sensitivity" or allergy, the court determined, "[fell] within the definition of an occupational disease." Id.
The company argues that the present case is more like Stokesv. Atrax Division of Wallace-Murray Corp., 466 So.2d 967
(Ala.Civ.App. 1985), than Dodson. In Stokes, this court affirmed a trial court's determination that two workers[3]
did not suffer from compensable occupational diseases. Stokes, 466 So.2d at 968. Both workers had alleged that they had been exposed to tungsten carbide during their employment and that the exposure had caused them to develop chronic bronchitis and asthma. Id. at 967. The trial court *Page 1209 
determined that the workers "suffered only a temporary allergic reaction, leaving no residual impairment." Id.
In addressing the appeal, the Stokes court discussedDodson, explaining that it had previously held in Dodson that "allergies are compensable occupational diseases if there is a chronic, continuing sensitivity or susceptibility created by the exposure to the hazard, which in turn causes an earning impairment." Id. at 968. Although the Dodson court had reversed a trial court's determination that the worker did not suffer from a compensable occupational disease based on this principle, the Stokes court affirmed the same determination inStokes, indicating that the evidence in Stokes, unlike that in Dodson, was conflicting and that neither worker testified that they had continued to suffer health problems. Id. TheStokes court commented:
 "It must be recognized that the results in this case are opposite to that of Dodson. However, it must also be recognized that each case must be decided on its own evidence. It must further be remembered that from conflicting evidence there may be different conclusions."
Stokes, 466 So.2d at 968.
The company also argues that Terry v. Webb Division MarmonIndustries, Inc., 582 So.2d 558 (Ala.Civ.App. 1991), supports a reversal of the award of workers' compensation benefits in the present case. The worker in Terry suffered from preexisting lung problems caused by a severe infection. Terry, 582 So.2d at 560. According to the worker's physician, the worker's problems were not caused by the chemicals with which he was working and instead could be caused by anything. Id. Based on that testimony, the trial court denied benefits. Id. This court affirmed that judgment, noting that the evidence supported a determination that the worker's preexisting condition was the sole cause of his disability. Id.
Although in this case the medical testimony concerning whether the worker's exposure to paint fumes caused or accelerated the development of his COPD was, at best, sharply conflicting, the medical testimony concerning whether the worker would suffer an aggravation of symptoms if exposed to paint fumes or other irritants was undisputed. Like the worker in Dodson, the worker in the present case was diagnosed by one doctor with an allergy to paint fumes and, according to nearly all the doctors who examined him, would be affected by many irritants — dust, pollen, heat, and household and industrial solvents. Unlike the workers in Stokes, the worker in the present case testified that he continued to suffer symptoms such as hoarseness and a persistent cough even after he left employment and that he would have an acute exacerbation of symptoms when exposed to an irritant. Unlike the worker in Terry, the worker in the present case did not suffer from any lung problems before his most recent employment with the company and his problems began with what one doctor described as a reactive asthmatic response to paint fumes. "[E]ach case must be decided on its own evidence," and "from conflicting evidence there may be different conclusions."Stokes, 466 So.2d at 968. We are not free to draw a different conclusion than the trial court simply because the company urges us to disbelieve testimony that the trial court chose to believe,see Bostrom Seating v. Adderhold, 852 So.2d 784, 795
(Ala.Civ.App. 2002), or because another case with similar facts was decided differently. Based on our standard of review, see
Ala. Code 1975, § 25-5-81(e)(2), we hold that substantial evidence supports the trial court's determination that the *Page 1210 
worker suffered from a compensable occupational disease.
 D. The Basis for Disability Argument
The company also argues that the worker was permanently and totally disabled as a result of his bypass surgery and not because of his COPD. Although Dr. Duggan's testimony suggested that the worker's shortness of breath had been made worse by the effects of the bypass surgery on his chest wall and although other evidence indicated that the worker received Social Security disability benefits based on his coronary artery disease, Dr. Duggan's testimony was that he did not think there was any way to separate the contribution of either COPD or the bypass surgery to the worker's shortness of breath. Testimony also established that the worker could not be around paint fumes and that he should avoid other irritants as well to prevent acute aggravation of his COPD. That restriction, according to the worker's vocational-rehabilitation counselor, Bill Vinson, was enough in the worker's case to amount to total vocational disability. Vinson also testified that the worker had no transferable skills, was suited for mostly manual-labor positions because of his limited educational status, and would not be employable in any manner because his shortness of breath and reactive-asthma symptoms caused him to need frequent rest periods and, at times, confined him to his home.
Under the Workers' Compensation Act, a worker is permanently and totally disabled if the worker is "incapacitate[d] . . . from working at and being retrained for gainful employment." Ala. Code 1975, § 25-5-57(a)(4) d. A worker is not required to be totally helpless; he simply must be unable to perform his trade or obtain other gainful employment. Southern Lifestyle Homes v. O'Rear,628 So.2d 645, 646 (Ala.Civ.App. 1993). Viewing all of the conflicting testimony in the light most favorable to the trial court's judgment, as we are required to do, see Whitsett v.BAMSI, Inc., 652 So.2d at 290, we conclude that substantial evidence supports the trial court's determination that the worker was permanently and totally disabled as a result of his allergy to paint fumes and the resulting aggravation of his COPD.
 VI. Appeal from the Third-Party Action
The company also appeals the dismissal of its third-party complaint against Wausau and INA, two of its previous workers' compensation insurance carriers. In large part, the company's brief reargues the issues raised in its underlying appeal in the workers' compensation action. However, the company argues, as do the insurance companies, that the "last injurious exposure rule" applies to the present case to determine which insurance carrier is responsible for payment of the worker's compensation award.
In North River Insurance Co. v. Purser, 608 So.2d 1379, 1382
(Ala.Civ.App. 1992), this court approved the use of the "last injurious exposure rule" in cases involving successive injuries and successive insurance companies. The rule provides that "liability falls upon the carrier covering risk at the time of the most recent injury bearing a causal relation to the disability." Purser, 608 So.2d at 1382. The determination of which of multiple insurance companies is liable turns on whether the second injury is characterized as a new injury, a recurrence of an old injury, or an aggravation of a prior injury. Id.
Of course, in the present case we are concerned not with two successive injuries, but instead with a continuing occupational disease. The Workers' Compensation Act *Page 1211 
addresses the date-of-injury issue, stating that the date of the injury in an occupational-disease case (other than those involving radiation exposure or pneumoconiosis) is the "date of the last exposure to the hazards of the disease in the employment of the employer in whose employment the employee was last exposed to the hazards of the disease." Ala. Code 1975, § 25-5-117(b). Because the worker continued to work between the first onset of symptoms throughout the remainder of INA's coverage period and through the entirety of Wausau's coverage period, deciding in October 1995 that he could no longer stand to work as a result of his symptoms, and because the date of injury under the Act is the date the worker was last exposed to the hazards of his employment, the trial court's factual determination that the worker was last exposed to paint fumes in October 1995 is conclusive of American Interstate's liability for the compensation award. Therefore, the trial court properly dismissed the third-party complaint against INA and Wausau.
2020861 — AFFIRMED.
2030212 — AFFIRMED.
YATES, P.J., concurs.
PITTMAN, J., concurs specially.
THOMPSON, J., concurs in the result, without writing.
MURDOCK, J., concurs in the result in part and dissents in part, with writing.
[1] There exists a controversy over the ending date of Wausau's coverage. Wausau contends that it cancelled the policy for nonpayment of premiums in May 1995; however, the company insists that it continued to pay premiums through August 1995. That issue is not before us in these appeals, so we will refer to the August 1995 date as the ending date of Wausau's coverage for purposes of this opinion.
[2] The worker died while the first appeal in this case was pending. A suggestion of death was filed in this court while the first appeal was pending. Nothing in the record before us indicates whether a substitution of party has been made.
[3] Stokes involved workers' compensation claims by three separate workers that were consolidated for trial. The trial court denied benefits to two workers, who then appealed.Stokes, 466 So.2d at 967.