MOORE, Judge.
Madison Academy, Inc. (“the employer”), appeals from a judgment-in which the Madison Circuit-Court (“the trial court”) awarded Lisa Hanvey (“the employee”) permanent-total-disability benefits pursuant to the. Alabama Workers’ Compensation Act (“the Act”), Ala.Code 1975, § 25-5-1 et seq. We reverse.

The Facts

Myasthenia gravis (“MG”) is an idiopathic disease in which the immune system of the human body spontaneously produces antibodies to attack certain proteins responsible for forming neuromuscular junctions, resulting in dysfunction of muscular contraction. According to the medical experts who testified in this ease, the employee developed MG at some point before April 22, 2011, when she first complained to an optometrist of double vision, or diplo-pia, a classic early sign of the disease. However, neither the. optometrist nor.her family physician, Dr. Cheryl Bazzle, who saw the employee on April 25, 2011, diagnosed MG. As a result, the employee did not immediately receive any treatment for the disease, which, although it cannot be cured, usually can be controlled successfully with medication that suppresses the production of destructive antibodies. Without treatment, however, the disease will progress ánd its symptoms would be expected to wax and wane.
The employee worked as a janitor on the campus of the private school operated by the employer and was able to fully perform the duties of her job without accommodation before May 2011. The employee testified that, on May 11, 2011, she twice was exposed to the strong odor of chemicals for approximately 45 minutes while walking up and down stairs adjacent to a school gymnasium. At that time, a contractor was refinishing the floors of the gymnasium using products that could be irritating or *121 harmful to the respiratory. system. The employee testified that, after smelling the odors from the gymnasium, she developed a strong headache, rawness in her throat, and difficulty talking and breathing, but, she said, she continued working after stepping outside to clear her head. The employee testified that her diplopia worsened three days- later, so she arranged an appointment with an ophthalmologist who, on May 20, 2011, ruled out a tumor as the cause of the employee’s condition and diagnosed a “visual migraine.”
The employee testified that, beginning on May 31, 2011, and extending to mid-June, she assisted in moving furniture and stripping the wax from the cafeteria and classroom floors on the employer’s campus. As part of that process, she was exposed to products containing chemicals that could be irritating or harmful to the respiratory system if inhaled in sufficient concentrations. The employee testified that she had assisted in the wax-stripping process every summer of her' employment but had experienced a headache' from' the smell only'the first summer. The employee, however, testified that, in June 2011, during the stripping process, she began to have trouble breathing.
The employee returned to visit Dr. Baz-zle on June 13, 2011, complaining of shortness of breath, which, she said, had begun one week earlier following exposure to chemical fumes and a change in her medication. The employee also complained of chest pain, dizziness, headaches, pedal'edema, phlegm production,- rhinorrhea, voice change, and fatigue. In a letter delivered to Carol Brittain, the business manager for the employer, Dr. Bazzle opined that the chemical exposure from stripping the floors was exacerbating .the chronic allergies and chronic sinusitis for which the doctor had long been treating the employee. Dr. Bazzle advised that the employee should avoid exposure- to any airborne chemicals, and she referred the employee to an allergist, - Brittain informed the em-. ployeé’s supervisor to reassign the employee from stripping the floors and to obtain a chemical-deterrent mask for the employee.
At the employee’s request, the employer filed a first report of injury on June 17, 2011, and referred the employee to an authorized treating physician. On June 21, 2011, the employee visited Dr. Bazzle with complaints of a worsening of the problems from her last visit. Dr. Bazzle diagnosed the employee with allergic rhinitis and probable asthma and recommended that the employee avoid all chemicals at work and at home. Later that same day, the employee visited Dr. Syed Hasan, the employer’s authorized treating physician, who diagnosed the employee with acute bronchitis from the chemical fumes and told- the employee to .wear a mask while working. The employee testified that she was not breathing well and could not physically perform the job,-so she-did not re-tento work after. June 21,2011.
The employee received continued treatment for bronchitis through the employer on June 27, 20Ü. On July 6, 2011, the employee visited Dr. Shashi Kumar, an allergist, on referral from Dr. Bazzle. Dr. Kumar noted that the employee had recurrent sinusitis and chronic nonallergic rhinitis, which was triggered by strong odors. Dr. Kumar also found that the results of the employee’s, breathing test showed that she had severe restrictive breathing. Dr. Bazzle testified .in her deposition that the restrictive-breathing findings resulted from the chemical exposure, as indicated in Dr. .Kumar’s records.. The restrictive-breathing findings were further confirmed by Dr. Laurence Carmichael, a pulmonologist, who examined .the employee on July 20, 2011, at the expense of the employer.
*122 On August 3, 2011, the employee returned to Dr. Bazzle complaining of continued breathing problems, diplopia, weakness, and fatigue. At that point, Dr. Bazzle indicated in her clinical notes that she suspected the employee may have MG. Dr. Bazzle referred the employee to Dr. Lanning Kline, a neuro-opthamologist at the University of Alabama at Birmingham Hospital (“UAB”), to confirm the diagnosis. On August 8, 2011, Dr. Kline performed a battery of tests on the employee at UAB. Before the employee could receive the test results, however, she experienced a severe depletion of oxygen-saturation levels on August 10, 2011, causing Dr. Bazzle to admit her to the hospital. Dr. Bazzle described the sudden decompensation of the employee’s condition as a “myasthenic crisis.”
Prom August 10 to August 20; 2011, while in the hospital,' the employee received treatment for respiratory failure from Dr. Murthy Vuppala. Dr. Amit Aro-ra, a neurologist, treated the employee with medications designed to combat an acute exacerbation of MG. Dr. Bazzle testified, however, that the UAB testing had not detected MG and that the tests conducted during the employee’s hospital stay also had not found the disease. Nevertheless, the employee responded positively to the treatment provided to her for MG, and her breathing difficulties improved to the point that she could be discharged. A week later, Dr. Arora admitted the employee into a different hospital for two days after she experienced recurrent symptoms of dizziness,' weakness, and difficulty swallowing. Dr. Arora also readmitted the employee to the same hospital on September 22, 2011, for continued weakness and other symptoms of MG. During that stay, Dr. Arora received laboratory results from the Mayo Clinic definitively diagnosing the employee with anti-MuSK MG, a rare form of the disease not diagnosable from usual protocols. Dr. Arora modified the employee’s treatment accordingly, and the employee’s condition and symptoms improved by the time of her discharge on September 30,2011.
On October 7, 2011, Dr. Arora wrote the employee a letter in which he .informed her of her diagnosis of anti-MuSK MG. Dr. Arora opined:
“It is very possible that the exposure that you had at work and your significant activity could have aggravated the condition. You significantly worsened and required multiple hospitalizations and multiple IV infusions and at 'times, myasthenia can be triggered by certain medications or by excessive activity or exposure to certain chemicals or.toxins. Hopefully, you should improve even further, as you will have significant disability at this time that prevents you from working for more than a few hours a day. ’
“I hope that you continue to improve, but I strongly recommend that you return back to your normal baseline activities at a cautious pace, as you have a potential of worsening of your underlying condition if you return too .aggressively.”
Dr. Arora continued to treat the employee with medications for MG and noted improvement in her condition in November 2011, although she remained symptomatic and, unable to work at that time. On November 13, 2011, Dr. Arora wrote:
“I do believe that the exposure you have had to the chemicals more than likely caused respiratory difficulties that led to you being hospitalized in the intensive care and ultimately led to this diagnosis. “We would like to avoid further episodes in the future and we have recommended that you avoid any of these exposures in the future as well.”
*123 Due to continuing MG symptoms, the employee consulted Dr. Gwen Claussen, a neurologist at UAB, on December 1, 2011. Dr. Claussen changed the employee’s medications and opined that she could not work at that time due to her weakness. In' a progress note dated January 13, 2012, Dr. Arora wrote that he believed that the employee was not capable of long-term employment based on her physical condition.
Dr. Claussen eventually recommended that the employee see Dr. Anjaneyulu Ala-pati, a local physician specializing in the treatment of MG. When Dr. Alapati first saw the employee on March 29, 2012, she had been through months of medical therapy designed to address her anti-MuSK MG. On physical exam, Dr. Alapati found no objective signs of the symptoms of the disease and considered the employee to be “stable.” Dr. Alapati specifically testified that he “didn’t find any evidence of [MG],” noting that the employee no longer exhibited signs of diplopia and that her strength was completely normal. He testified that he planned to continue to treat the employee with different types and dosages of MG medication to keep the disease checked. Dr. Alapati saw the employee twice more, on April 30, 2012, and July 30, 2012; at both of those visits, the employee’s physical exam was unchanged and the disease, in the doctor’s words, remained in “long remission.” In his deposition, Dr. Alapati testified as follows:-
“Q. [Employer’s counsel:] So in controlling the symptoms with [MG]; is it true that -the person never does return to the condition they were in prior to the contraction of [MG]?
“A. As I said, like sedentary desk work, we will go back to work, Anything like you said janitorial work or anything working in like, you know, construction work, they will not go back to completely normal. There will be some limitations.”
Dr. Alapati recommended that the employee refrain from physically demanding work because any exertion is known to trigger a temporary worsening of MG symptoms.
•Dr. Bazzle testified in her deposition that the employee had MG before she was exposed to any chemicals at work, that it was a personal disease independent of the employment, and that the employee continued to suffer from the disease throughout her employment in May and June 2011. When the employee was exposed to chemicals at work, Dr. Bazzle testified, that exposure flared the employee’s chronic respiratory problems, which, worsened the employee’s MG and led to her myasth-enic crisis. Dr. Alapati also testified that any infection can trigger MG weakness. On page 38 of her deposition, Dr. Bazzle testified as follows:
“Q. [Employer’s counsel:]' ... Could shortness of breath have been triggered or aggravated ‘by factors other than chemicals?
“[Employee’s counsel]: Object to the form.
“A Her underlying condition was— was certainly a factor and yes, she’s overweight and probably deconditioned because of that and also deconditioned because she was, chronically ill from the [MG] not being' diagnosed. And then she got exposed to chemicals, which flared up her — her respiratory problems that she had anyway and then triggered the immune-mediated disease that she had going on. And there you have it, this whole milieu of — of factors, exactly what you described, multiple factors that — that went in to a bad situation — a bad situation ■ that she has not risen from.”
At another point in her deposition, Dr. Bazzle testified that, absent -her exposure *124 to chemicals at work, the employee would not have experienced the disability from her MG at the time, in the manner, and to the degree that she did.
After page 38 ' of her deposition, Dr. Bazzle agreed that the employee’s respiratory difficulties, although-severe for several months, eventually improved. Dr. Bazzle testified that she was aware of no evidence indicating that the employee continued to have chemicals in her body from her exposure. Dr. Bazzle testified as follows:
“Q: [Employer’s- counsel:] With regard to any possible effect of the chemical exposure in June of 2011 on [the employee],' is it your opinion that the exposure' temporarily aggravated or worsened her respiratory conditions?"
“A: Yes.”
Dr. Bazzle also acknowledged that the severe weakness the employee had exhibited during her myasthenic crisis had improved after the employee received treatment for MG. Dr. Bazzle testified that the employee experienced muscle weakness before her chemical exposure and that she would be expected to continue to have weakness simply as a consequence of her disease. Dr. Bazzle admitted that she had not reviewed any peer-review literature that would indicate that the employee’s current medical condition would have been any better if she had not worked for the employer.
At trial, the employee testified that she had recovered from her respiratory difficulties, without lingering effects.. The employee testified that she continues to experience fatigue on a daily basis. The employee testified as follows:
“Q. [Employee’s counsel:] What does that tiredness look like? What is it that makes you tired? Do you know?
“A. The disease.”
John McKinney, a vocational expert for the employee, issued a report indicating that the employee could not work due to her. physical limitations, all of which were assigned by the employee’s physicians due to her ongoing MG.

The Judgment

In its judgment, the trial court found that the employee was - fully capable of performing her job before her chemical exposure; that, in May and June 2011, the employee was, through her employment, exposed to chemicals capable of causing respiratory problems; and that that exposure did, in fact, cause the employee a respiratory infection, which, along with heavy physical exertion at work, triggered and aggravated her MG, which,, in turn, worsened her respiratory problems and led to the employee’s myasthenic crisis. The trial court found that the exposure worsened the employee’s underlying condition and was “not merely a recurrence of symptoms inherent in the etiology of the preexisting condition.”
.In its conclusions of law, the trial court acknowledged that the employee, “may arguably have had a preexisting condition,” but it determined that such a preexisting condition did not disqualify her from receiving workers’ compensation-
“because her employment has aggravated and combined with her [MG] to produce disability; significantly, her doctor has concluded that ‘her disease was worsened by the exposure-to chemicals.’ Because she was able to perform her duties prior to the injury, [the employee] will receive compensation without regard for any preexisting medical condition or problems.”
The trial court further concluded that “the work-related exposure has rendered [the employee] unable to return to work at her job or perform her accustomed trade.” *125 The trial court awarded the employee permanent-total-disability benefits.
The employer filed a timely post-judgment motion arguing, among other things, that the employee had proven only that her MG had been temporarily aggravated and that she had not proven that she had sustained any permanent injury as a result of her work-related exertion and exposure. The employer contended that the employee experienced only a temporary flare-up of her respiratory and MG symptoms, which had been resolved by medications used to control MG, and that she had been in remission since Dr. Alapa-ti began treating her. The employer maintained that it was liable only for the temporary aggravation and its disabling effects, but not for the permanent underlying condition. .
After holding a hearing on the post-judgment motion on April 4,2018, the trial court denied the motion on April 24, 2018, without comment. The employer thereafter timely appealed to this court.

Issue

In its brief to this court, the employer concedes that the fact that the employee had preexisting MG does not disqualify her from receiving workers’ compensation benefits. The employer also does-, not contest the trial court’s finding that the employee’s MG was aggravated by her physical exertion and chemical exposure on the job in May and June of 2011. The employer further admits- that the employee was entitled to temporary-total-disability benefits under Ala,Code 1975, § 25~5-57(a)(l), for .the period during which she was recovering from the aggravation.
The employer argues, however, that the trial court erred in awarding the employee permanent-total-disability benefits because, it says, any aggravation of the employee’s personal disease by the chemical exposure was only temporary. The employer contends that, once the employee received appropriate medical treatment, she recovered from her myasthenic crisis and has since been in remission. Any further symptoms of MG, the employer maintains, are attributable solely to the employee’s underlying condition, and, the employer asserts, any permanent disability emanating from the employee’s MG is not compensable.

■Standard of Review

The standard this court uses to review workers’ compensation eases is well settled:
“Section 25 — 5—81(e), Ala.Code 1975, provides the standard of review in workers’ compensation eases:
“ ‘(1) ,-In reviewing the standard of proof set forth herein and other legal issues, reyiew by the Court of -Civil Appeals shall be. without .a presumption of correctness.
“ ‘(2) In reviewing pure findings of fact, the finding of the circuit court shall not be reversed if that finding is supported by substantial evidence.’
“Substantial evidence is * “evidence of such weight and quality that fair-minded persons in the exercise' of impartial judgment can reasonably infer the existence of the fact sought to be proved.” Ex parte Trinity Indus., Inc., 680 So.2d 262, 268 (Ala.1996) (quoting West V. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989)).”
White Tiger Graphics, Inc. v. Clemons, 88 So.3d 908, 910 (Ala.Civ.App.2012).
In reviewing findings of fact,
“[o]ur review is restricted to a determination of whether the trial court’s factual-findings are supported by substantial evidence. Ala,Code 1976, § 25-5-81(e)(2). This statutorily mandated scope of review does not permit this *126 court to reverse the trial court’s judgment based on a particular factual finding on the ground that substantial evidence supports a contrary factual finding; rather, it permits this court to reverse the trial court’s judgment only if its factual finding is not supported by substantial evidence. See Ex parte M & D Mech. Contractors, Inc., 725 So.2d 292 (Ala.1998).”
Landers v. Lowe’s Home Ctrs., Inc., 14 So.3d 144, 151 (Ala.Civ.App.2007).
“ ‘If [substantial evidence supports the trial court’s findings of fact], then the judgment of the trial court must be affirmed. The appellate court is prohibited from reweighing the evidence, i.e., it is not to consider whether in its opinion the “substantial evidence” before the trial court might have caused the appellate court — if it had been the fact-finder — to find the facts to be different from what the trial court found' them to be.’
“Ex parte Staggs, 825 So.2d 820, 822 (Ala.2001). We cannot substitute our judgment for that of the trial court. Ex parte Kmart Corp., 812 So.2d 1205 (Ala. 2001). We may not reverse a judgment simply because we would have decided the facts differently than the trial court. Id.”
Boise Cascade Corp. v. Jackson, 997 So.2d 1042, 1047 (Ala.Civ.App.2008).

Discussion

In cases involving physical injuries, in order to recover compensation for a permanent disability, an employee must first establish that he or she has sustained a permanent injury. See B.F. Goodrich Co. v. Lee, 271 Ala. 312, 123 So.2d 117 (1960). An employee can satisfy the burden of proving a compensable injury by showing that exertion or exposure to harmful substances during the employment contributed as one of multiple factors to aggravate an underlying disease. See Ex parte Valdez, 636 So.2d 401, 405 (Ala. 1994). To prove that employment factors permanently aggravated the disease, an employee may rely on circumstantial evidence indicating that, since the accidental exertion or exposure, the employee experienced new or increased symptoms that “have persisted ever since.” Waters Bros. Contractors, Inc. v. Wimberley, 20 So.3d 125, 134 (Ala.Civ.App.2009). Otherwise, the employee may prove permanency by showing that, because of the aggravation of the disease by employment factors, the employee sustained a residual and chronic impairment to his or her system, making the employee more susceptible to reinjury. See Dodson v. Atrax Div. of Wallace-Murray Corp., 437 So.2d 1294 (Ala.Civ.App.1983); and Edmonds Indus. Coatings, Inc. v. Lolley, 893 So.2d 1197 (Ala.Civ.App.2004).
On the other hand, if a work-related accident temporarily aggravates a preexisting condition, not contributing at all to the preexisting condition after a period, the employer is liable for compensation under the Act only for the temporary disabling effects caused by the accident. See, e.g., Alamo v. PCH Hotels & Resorts, Inc., 987 So.2d 598 (Ala.Civ.App.2007) (affirming judgment denying permanent-disability benefits to employee based oh evidence indicating that employee had only temporarily aggravated preexisting back problem while working for employer and that any continuing symptoms resulted solely from preexisting condition); Howe v. Choctaw Emergency Mgmt. Servs., 725 So.2d 978, 979 (Ala.Civ.App.1998) (finding that employee had not sustained permanent partial disability as result of back injury was supported by substantial evidence; doctor testified that back injury caused lumbar strain from which employee recov *127 ered one year later and that remaining back pain was due to preexisting condition); and Cobb v. Coyne Cylinder Co., 719 So.2d 219, 222 (Ala.Civ.App.1998) (affirming judgment denying permanent-disability benefits to employee based on evidence indicating that employee had only temporarily injured his shoulder and that any permanent problems resulted from preexisting condition). After an employee recovers from a temporary aggravation, an employer bears no liability under the Act for any lingering or permanent injury or disability caused solely by a preexisting condition. See Sexton v. Pendley, 474 So.2d 1148, 1150 (Ala.Civ.App.1985) (affirming award of temporary-total-disability benefits, but denying permanent-disability benefits, based on finding that work-related accident caused temporary injury but that permanent back problems related solely to employee’s obesity); and DeHart v. Ideal Basic Indus., Inc., 527 So.2d 186, 138-39 (Ala.Civ.App.1988) (trial court did not err in awarding only 15% permanent-partial-disability benefits based on expert medical evidence indicating that preexisting degenerative disk disease, not work-related back strain, caused majority of employee’s permanent disability).
In this case, the employer concedes that the evidence supports a finding that the exertion and chemical exposure in her employment in May and June 2011 aggravated the employee’s MG; however, thé employer maintains that the record contains no evidence indicating that the aggravation persists. We agree.
Dr. Alapati testified, without dispute, that physical exertion causes only a temporary worsening of MG weakness. As for the chemical exposure, Dr. Bazzle testified that the inhalation of the fumes from the refinishing products aggravated the employee’s chronic respiratory problems, which, in turn, caused the decompensation of the employee’s underlying MG. The voluminous medical records and the testimony of the employee herself confirm that the employee recovered completely from her shortness of breath and acute respiratory failure following her hospitalizations in August and September 2011. Based on that undisputed evidence, Dr. Bazzle testified that the chemical exposure had only temporarily aggravated the employee’s respiratory system and that she was aware of no evidence indicating that any chemicals remained in thle employee’s body. The record contains no evidence indicating that the aggravation resulted in any residual chronic restrictions or sensitivity making the employee more susceptible to further injury than she already was.
Although thé employee underwent a myasthenic crisis, once her physicians accurately diagnosed her condition and provided appropriate medical treatment, any new or increased symptoms of MG completely abated. When the employee was examined by Dr. Aapati on March 29, 2012, he found no evidence of the symptoms of the disease that had been so active months earlier, and Dr. Alapati testified that the employee remained in remission throughout her treatment with him. Dr. Alapati testified that the employee’s MG could wax and wane in the future, but he attributed the expected symptoms to be a part of the normal course of the disease. The record shows without dispute that any symptoms from the aggravation of the MG had not “persisted ever since.” Wimberley, 20 So.3d at 134. Furthermore, no physician opined that the myasthenic crisis rendered the employee more prone to future relapses or increased the likelihood of another myasthenic crisis.
To support the position that the employee did permanently aggravate her MG, the dissent relies on two excerpts from the deposition of Dr. Bazzle in which she *128 opined that the employee “ha[d] not risen from” her “bad situation” and that the employee would not have been disabled at the time and in the degree to which she was absent her chemical exposure.[1] 179 So.Bd at 132 (Thompson, P.J., dissenting). However, when determining whether those excerpts are substantial evidence of a permanent' aggravation, this court does not view that testimony in isolation but, rather, in the context of the entirety of Dr, Bazzle’s deposition testimony. See McGough v. G & A, Inc., 999 So.2d 898, 905-06 (Ala.Civ.App.2007); see also Ex parte Price, 555 So.2d 1060, 1063 (Ala. 1989) (holding that the court must consider the overall substance and effect of the whole of the evidence and not just the witness’s, use of “any magical words or phrases”). Dr, Bazzle fully explained her opinion throughout the remainder of her deposition when she testified that the chemical exposure had caused the employee a temporary worsening of her respiratory ailments, that the worsening of her respiratory problems resulted - in a depletion of the employee’s oxygen-saturation levels, that that depletion triggered a myasthenic crisis, that the employee improved with appropriate treatment once her condition was properly diagnosed, and that she expected that the employee would continue to have MG weakness from the disease itself. Given further the uncontro-verted evidence indicating that the employee became completely asymptomatic, or MG “stable,” during Dr. Alapati’s care in -2012, this court cannot consider the excerpts upon which the dissent relies as constituting substantial evidence indicating that the chemical exposure does, in fact, continue to' contribute to the employee’s personal disease.
The record likewise contains no substantial evidence indicating that the “work-related exposure has rendered [the employee] unable to return to work at her job or perform her accustomed trade,” as the trial court found. No doctor opined that work-related factors “accelerated [the employee’s] disease to the point ... she could never perform manual labor again,” 179 So.3d at 135 (Thompson, P.J., dissenting), and no evidence shows that the employee’s “exposure ... hastened or accelerated her MG to the point that she is no longer able to perform jobs for which she is qualified.” 179 So.Sd at 133 (Thompson, P.J., dissenting). After she recovered from her myasthenic crisis, .the. employee did not have. any residual symptoms from her chemical exposure that limited her activities. The employee herself testified.that she suffers fatigue solely from “the disease.” , Dr. Alapati assigned physical and work restrictions to the employee in order to avoid exacerbating the disease. . Dr, Bazzle testified in an affidavit to. the physical limitations of the employee, but she attributed those limitations to the employ *129 ee’s weakness, which remains due to her MG.[2]
The dissent agrees that the employee’s MG symptoms are “dormant” and that engaging in physical labor will cause a return of her symptoms. 179 So.3d at 132 (Thompson, P.J., dissenting). The trial court specifically found that the exertion of moving furniture for the employer in May and June 2011 contributed to the employee's work-related injury. That finding is based on the medical testimony that the employee had undiagnosed MG at that time and that exertion will trigger and cause a temporary worsening of MG weakness. Because she has MG, the employee can expect that, if she exerts herself, she may have a recurrence or relapse of MG symptoms. Acknowledging that the employee’s MG was in long remission, Dr. Alapati nevertheless placed restrictions on the employee’s activities specifically to prevent a recurrence of symptoms. Nothing in the record suggests that Dr. Alapati assigned those restrictions because the employee’s myasthenic crisis rendered her even more susceptible to relapse due to: physical exertion.
Likewise, it cannot be reasonably inferred from the record that the exposure “cut short her working life” or that, “[i]f not for the exposure to, the chemicals, [the employee] might have been able to continue working normally for years to come.” 179 So.3d at 133 (Thompson, P.J., dissenting). Dr. Alapati testified at length about the effect of MG on employability, and his testimony established that the employee would not be able to work as a janitor because of her MG alone. In his report, McKinney relied on the restrictions assigned by the doctors solely on account of the .employee’s MG when rendering his opinion that the employee could no longer work. The employer does not dispute that the employee is unable to work, but it correctly observes that her permanent incapacity stems solely from her lingering and incurable MG, as established by undisputed evidence. By reviewing the record and determining that no substantial evidence supports a finding that the employee is permanently and totally disabled from the aggravation of the MG, as opposed to the MG itself, this court is not reweighing the evidence, or substituting its opinion for that of the trial court, but applying the law to the undisputed facts....
We agree with the dissent that "an employee with a preexisting condition is not disqualified from receiving compensation based on that fact alone. 179 So.3d at 133 (Thompson, P.J., dissenting). We disagree, however, with the proposition in the dissent" that “‘“[a] preexisting condition that did not affect the [worker’s] work performance before the disabling injury is not considered, pursuant to the Act, to be a pre-existing condition.” ’ ” 179 So.3d at 133 (Thompson, P.J., dissenting) (quoting SouthernCare, Inc. v. Cowart, 146 So.3d 1051, 1063 (Ala.Civ.App.2013), quoting in turn Waters v. Alabama Farmers Coop,, Inc., 681 So.2d 622, 623-24 (Ala.Civ.App. 1996)). That legal fiction applies solely to cases falling under Ala.Code 1976, §§ 25-5-57(a)(4)e. and 26-6-58, when determining whether compensation should be apportioned oh account of a previous injury or infirmity See Ingalls Shipbuilding Corp. v. Cahela, 251 Ala. 163, 36 So.2d 513 (1948). In this case, the court is not ap *130 portioning compensation because a preexisting condition has increased or prolonged the disability of the employee from her work-related exertion and chemical exposure. The court is, instead, applying the law of medical causation arising from Ala. Oode. 1975, ■ § 25-5-51, which provides-compensation only for disabling personal injuries caused by the employment.
Under the law as it relates to' medical causation, an employee must prove at a minimum that work-related factors combined with the preexisting condition to produce the injury and disability claimed. See Wimberley, 20 So.3d at 132 (“[A] trial court may not consider the effect of adverse health conditions or symptoms not satisfactorily proven to be medically caused by the claimed accident.”); Howe, supra. In the absence of such proof, an employee cannot recover compensation for a disability resulting from a preexisting condition because the employer is not an insurer of the health of the employee. See generally Ex parte. Trinity Indus., Inc., 680 So.2d 262, 268 (Ala.1996). Hence, a court cannot award compensation for a disability arising solely, from a preexisting condition and its natural progression merely because, at one time, the employee was able to work normally despite that condition. See Alamo, 987 So.2d at 603-06 (Moore, J., concurring specially) (explaining error in applying apportionment rules when deciding medical causation). In fact, if the evidence establishes that the preexisting condition, and not the work-related accident, is the root of the disability, a cpurt must find that the disability is not compensable. See Dempsey v. White Consol. Indus., Inc., 620 So.2d 38, 40 (Ala.Civ. App.1993).
Based on the absence of any evidence indicating that the chemical exposure permanently contributed to the employee’s MG, and based further on the uncontra-dicted medical evidence indicating that any disabling symptoms the employee might now be experiencing, or any symptoms the employee would likely experience in the future, arise solely from the disease itself, the trial court, as a matter of law, could have determined only that the permanent injury and disability resulting from that preexisting condition was not compensable.
For the foregoing reasons, we reverse the judgment of the trial court and remand the cause for the trial court to enter a judgment consistent with this opinion.
REVERSED AND REMANDED.
THOMAS and DONALDSON, JJ., concur.
PITTMAN, J., concurs in the result, without writing.
■ THOMPSON, P.J., dissents, with writing, '

. The- dissent also cites the portion of Dr. Bazzle’s deposition in which she testified as ' follows;
"Q. [Employer’s counsel;] Are you aware of any peer review or medical research articles or other medical literature that would suggest that [the employee's] current medical condition-would have been. any. better if she had not worked at- [the employer's campus]?
''[Employee’s counsel]: Object to the form,
"A. I don't think so.”
That excerpt does not support the dissent’s position that the employment exposure permanently contributes to the employee's MG. To. the contrary, it shows that the doctor has not reviewed any medical data indicating that the employee's current condition would be any better if she had not experienced the exposure Wt: work,.

. The parties did not depose Dr, Arara or Dr. Claussen to obtain their opinions as to the employee's permanent limitations, To the extent they'stated any opinions regarding the employee's permanent disability, their opinions related solely to the disability arising from the disease itself and restrictions necessary to avoid future exacerbation of the disease.