[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1104 
In this workers' compensation case, Associated Grocers of the South, Inc. ("the employer"), appeals an award of death benefits to Patricia Goodwin ("the dependent"), entered by the Jefferson Circuit Court on March 20, 2006. In its judgment, the trial court determined that the sudden cardiac death of Carl Goodwin ("the employee") on May 26, 2003, was "precipitated" by a May 7, 2003, motor-vehicle accident arising out of and in the course of his employment. Accordingly, the trial court awarded dependency and burial benefits. We affirm.
 I.
The facts pertinent to this appeal show that the employee worked as a truck driver for the employer. On May 7, 2003, while in the course of his employment, the employee was involved in a motor-vehicle accident in which his truck overturned. After being cut out of the cab of the truck, the employee was transported to Vaughan Regional Medical Center where he was admitted with complaints of bilateral chest pain. Radiological studies revealed multiple bilateral rib fractures, a small right pneumothorax, a pulmonary contusion, and a right clavicle fracture.
The dependent arrived at the hospital to find the employee hurt, crying, and very upset. The dependent noticed that the employee was having a lot of trouble breathing. The employee underwent an operation to drain the pneumothorax later that evening. The next morning, after the employee underwent chemical testing that showed elevated cardiac enzymes and after the doctors noted that the employee had an excessively fast heart beat, a Dr. Seydi Aksut was consulted. Dr. Aksut examined the employee and listed as his impression: "1. Congestive heart failure 2. Status post motor vehicle accident."
Not long after Dr. Aksut's examination, the employee transferred to the University of Alabama Birmingham ("UAB") Emergency Department for continued treatment on May 8, 2003. The "complete diagnosis list" in an initial-assessment form indicated that the employee was suffering from multiple bilateral rib fractures, a right-sided pneumothorax, and a right pulmonary contusion. However, the emergency-room doctor who examined the employee found a regular heart rhythm. The emergency-room doctor admitted the employee into the hospital for intensive care.
The employee spent the next five days in the hospital recovering from his acute injuries. During that time, he received intravenous injections of morphine sulfate to control his pain. An orthopedic surgeon determined that the employee did not require surgery to repair his clavicle but placed the employee's arm in a sling. On May 13, 2003, the employee was discharged from UAB with instructions to progressively increase his physical activities over the next month. The medical records show that the employee did not receive any direct treatment for congestive heart failure or any other cardiac condition while at UAB.
The dependent testified that when the employee was discharged from the hospital and allowed to go home, he tried to lie down in his bed, but he could not, so he got into his recliner, where he stayed for the majority of the next 10 days. The dependent explained that when the employee *Page 1105 
attempted to move around, he experienced difficulty breathing. As the dependent described it, the employee's breathing "just got worse and worse, and he would just break out into a sweat and he'd just sit there and go (indicating), real hard trying to catch his breath, and he couldn't."
On May 24, 2003, the employee asked the dependent to take him to the hospital because he was having a hard time breathing. The dependent observed that he was sweating, shaking, and turning white. The dependent testified that because they were both scared by the employee's symptoms, she called an ambulance to transport him to UAB.
The triage record at the UAB emergency room shows that the employee arrived at 8:00 a.m. with complaints of shortness of breath that had begun the day before. After examination, a UAB emergency-room doctor concluded that the employee had "acute congestive heart failure decompensation secondary to trauma" and admitted him into the hospital for treatment. Two days later, after complaining of an acute shortness of breath and chest pain on his left side, the employee slumped to the side without a pulse. He briefly revived, but he died shortly thereafter.
At the time of his death, the employee was 55 years old, was six feet tall, and weighed approximately 320 pounds. Medical records introduced into the record revealed that before his motor-vehicle accident the employee had a history of smoking four packs of cigarettes a day, hypertensive disease (high blood pressure), asthma, hypercholesterolemia, coronary artery disease, and type 2 diabetes. In 2001, after reporting chest pain and shortness of breath to Dr. Andrew Brian, a cardiologist, the employee had received a renal-artery stent and had started taking Lasix, a diuretic, which he took until his death.
On May 27, 2003, Dr. Stephanie Reilly, who is board-certified in anatomic and clinical pathology, performed an autopsy on the employee to determine the cause of his death. During the autopsy, she found significant enlargement of the employee's heart, as well as signs of coronary artery disease and congestive heart failure, but no evidence of infarction. Dr. Reilly did not find any other damage or injury to the heart muscle itself, although she observed the rib fractures and the clavicle fracture that had been caused by the motor-vehicle accident. Dr. Reilly concluded in her autopsy report that the employee had died due to sudden cardiac death and stated that "[h]ypertensive heart disease in combination with significant coronary artery disease is the cause of death." In her report she described sudden cardiac death as "a natural death due to cardiac causes, heralded by abrupt loss of consciousness within one hour of onset of acute symptoms in an individual who may have known preexisting heart disease but in whom the time and mode of death are unexpected."
Dr. Reilly testified at trial that when she performed the autopsy she had only limited medical records to review. At the time of the autopsy, she concluded that the significant chest trauma the employee had experienced in his motor-vehicle accident served as a precipitating cause for the employee to be at an increased risk for sudden cardiac death. She stated that, since the time of the autopsy, she had reviewed the Vaughan Regional Medical Center records showing that the employee had been diagnosed with congestive heart failure within 24 hours of the accident. Based on this additional information, Dr. Reilly opined that, before the motor-vehicle accident, the employee had "compensated" congestive heart failure and that *Page 1106 
the accident had caused him to develop "decompensated" congestive heart failure. Dr. Reilly explained that the heart can function without medical intervention when a patient has compensated congestive heart failure but that when the congestive heart failure becomes decompensated the patient will require medical intervention to maintain heart function.
Dr. Reilly stated that the injuries the employee received in the accident, along with the stress and pain associated with those injuries,
 "seem to be the proximate cause, the initiating factor that sent him from compensated heart failure to decompensated heart failure. Now can I say absolutely that? No, because that's not an anatomic diagnosis."
The doctor repeated several times that she could not anatomically prove her opinion as to the precipitating cause of the employee's death. The doctor related that it appeared to her from the timeline that the employee had suffered from severe heart disease before the accident; that he sustained injuries in the accident; that he then went into heart failure; that he received treatment and improved; that once treatment, i.e., the morphine sulfate, was removed, he went back into heart failure; and that he was ultimately readmitted to UAB for heart failure. Dr. Reilly stated that, if the employee had had a healthy heart, he would have survived his injuries but that the injuries caused him to go into decompensated congestive heart failure following the accident. She cited a noted medical treatise to support her opinion that pain can cause a change from compensated to decompensated congestive heart failure. The doctor testified that the employee was at a high risk to suffer cardiac death at some point, but that the accident seemed to be the event that led to his death as that time. The doctor stated that if she had filled out the employee's death certificate she would have described the employee's death as an accidental death and would have listed the cause of death as sudden cardiac death because of hypertensive heart disease and coronary artery disease with the motor-vehicle accident being listed as a significant condition contributing to the death.
On cross-examination, Dr. Reilly acknowledged that the employee's medical records before May 24, 2003, did not show signs of decompensated congestive heart failure, but she explained that the employee was being treated for the condition, at least indirectly, with morphine sulfate, which decreases the "preload" on the heart and improves congestive heart failure. Dr. Reilly also agreed that the employee probably died from an arrhythmia — an irregular heartbeat — commonly associated with congestive heart failure. Dr. Reilly testified that several factors can contribute to an arrhythmia, with congestive heart failure being a high risk factor. The doctor testified that pain, interacting with a diseased heart, can trigger an arrhythmia. If pain did indeed interact with the heart disease, the patient would be expected to show signs of heart failure within 1 to 24 hours, which, according to Dr. Reilly, the employee did when he was diagnosed with congestive heart failure on May 8. According to Dr. Reilly, the employee did not die at that time because he received treatment; after treatment was stopped, the condition worsened, as evidenced by the employee's increasing shortness of breath described by the dependent. The doctor conceded that plaque rupture in the blood vessels surrounding the heart is commonly found postmortem when pain contributes to sudden cardiac death — none was found in the employee's autopsy — but, in her experience, such damage is not always found on autopsy. She also admitted that pain is just one precipitating cause and that no *Page 1107 
one can predict what particular risk factor among the risk factors associated with congestive heart failure would actually trigger a decompensated congestive heart failure or a fatal arrhythmia, although she believed from the timeline that the trauma of the motor-vehicle accident was the precipitating factor for the employee. Finally, the doctor conceded that the employee, because of his genetics and lifestyle, had every known risk factor for congestive heart failure; that acquired heart disease is the most important factor predisposing a person to arrhythmias; and that the employee was a "walking time bomb." She simply believed the accident set off "the bomb."
To refute the opinion of Dr. Reilly, the employer offered the deposition of Dr. James Atkinson, the director of autopsy service and a pathology professor at Vanderbilt University. Dr. Atkinson espoused a particular area of expertise in cardiac pathology. Dr. Atkinson reviewed the employee's medical records, the autopsy report, recut tissue slides from the autopsy, and the deposition of Dr. Reilly. After his review, he agreed that the employee had died as a result of sudden cardiac death due to an arrhythmia stemming from a combination of hypertensive heart disease and coronary artery disease. He disagreed, however, with Dr. Reilly's conclusion that pain from the injuries sustained in the motor-vehicle accident precipitated the arrhythmia that ultimately led to the employee's death. He testified that the injuries from the motor-vehicle accident did not in any way contribute to the employee's death.
Dr. Atkinson explained that the employee had every known risk factor for the narrowing of the coronary arteries, including his age, sex, smoking history, high cholesterol, high blood pressure, family history of premature heart disease, obesity, and type 2 diabetes. Dr. Atkinson maintained that those conditions led to the enlargement of the employee's heart and the dilation of the chambers of the heart, which made the employee prone to a fatal arrhythmia. According to Dr. Atkinson, it was these conditions, rather than any stress, that most likely led to the employee's sudden cardiac death.
Dr. Atkinson testified that sudden cardiac death has two components. First, the heart must be anatomically abnormal, which was the case with the employee. Second, some factor triggers the already abnormal heart to create an abnormal electrical rhythm. In this case, Dr. Atkinson believed that the dilation of the heart chambers was the trigger for the employee. He stated that stress or pain is not a trigger for congestive heart failure. Dr. Atkinson testified that the pain from the injuries the employee had sustained in the motor-vehicle accident did not cause or contribute to his fatal arrhythmia.
Dr. Atkinson admitted that stress can cause sudden cardiac death, especially in people who are predisposed to cardiac problems, but that in such cases the coronary arteries develop sudden occlusions that can be seen as lesions, hemorrhages, or blood clots in autopsies. Because the employee's autopsy did hot exhibit those findings, Dr. Atkinson testified, it was unlikely that stress or pain contributed to his sudden cardiac death. Moreover; according to Dr. Atkinson, if stress or pain from the motor-vehicle accident had contributed to the employee's death, the fatal arrhythmia would have been expected to occur at the time of the accident or shortly thereafter. Dr. Atkinson conceded that prolonged pain and anxiety of the type the employee had suffered after the accident could trigger a fatal arrhythmia, but he maintained that, in this case, it was unlikely this stress triggered the employee's sudden *Page 1108 
cardiac death. Dr. Atkinson could not absolutely rule out stress or pain being a trigger in the employee's death, but he insisted that it was unlikely. He disagreed with Dr. Reilly's opinion that the employee had died when he did due to the injuries from the accident, saying it was impossible to predict when sudden cardiac death is going to occur and that the employee probably would have died on May 26, 2003, even if he had not been in the motor-vehicle accident.
 II.
The employer initially argues that the trial court erred in failing to apply the "nonaccidental" injury analysis fromEx parte Trinity Industries, Inc., 680 So.2d 262
(Ala. 1996). The employer asserts that all cardiac-injury cases should be treated as "nonaccidental" injuries requiring proof of legal causation, i.e., that the employment exposed the employee to an increased risk of a cardiac event, and medical causation. The employer bases this argument on an excerpt fromMorell v. Tennessee Valley Press, Inc., 716 So.2d 1282
(Ala.Civ.App. 1998), in which this court stated: "The law regarding nonaccidental injuries was established for cases involving ailments such as pneumonia, heart attack, stroke, aneurysm and diabetic coma." 716 So.2d at 1285. The court further stated that such injuries may be from natural causes, implying that any injury that may arise from natural causes should be analyzed using the "nonaccidental" injury test.Id.
However, the employer overlooks subsequent language fromMorell in which this court clarified that "[a]n injury does not become `nonaccidental' just because the ultimate injury at issue . . . could have been caused by factors unrelated to employment." 716 So.2d at 1286. This language discloses that it is not the nature of the injury, but the nature of its cause, that determines which analysis should be used.
Morell cited Trinity as the lone authority for its statement that the law of "nonaccidental" injuries evolved to address certain types of injuries. InTrinity, the Supreme Court did refer to the very difficult problem of determining when "heart attacks and other similar physical ailments of a `nonaccidental' nature, which, like pneumonia, can and do occur independently of on-the-job risks, `arise out of the claimant's employment."680 So.2d at 266. Taken alone, this language would indicate that cardiac injuries should always be treated as being "nonaccidental" in nature. However, the Supreme Court later in the same opinion clarified its holding when it said that an injury is nonaccidental if "the injury was not caused by a sudden andunexpected external event." 680 So.2d at 269 (emphasis added). This plain language indicates that cardiac injuries are not always to be treated as "nonaccidental" injuries; rather, a cardiac injury may properly be categorized as an "accidental" injury in circumstances in which the injury was allegedly caused by a sudden and unexpected external event.
Moreover, Trinity specifically held that in "accidental" injury cases, i.e., cases in which the claim arises from an injury due to a sudden and traumatic external event, the claimant need only prove that the accident occurred and that the accident medically caused the injury complained of. 680 So.2d at 266 n. 3. Footnote 3 in Trinity
indicates that if the claimant proves a sudden and traumatic external event medically caused a cardiac injury, the claimant need not additionally prove legal causation.
In Great Atlantic Pacific Tea Co. v. Davis,226 Ala. 626, 148 So. 309 (1933), the employee suffered from a chronic valvular disease. While working in his employer's meat market, he received an electrical *Page 1109 
shock from a sausage grinder. He immediately began suffering headaches, dizziness, and vomiting. After three days, he was confined to his bed, his symptoms growing worse, until he died on the seventh day after the accident. The evidence indicated that the electrical shock accelerated the employee's preexisting cardiac condition to produce death. The Supreme Court found that the trial court had properly awarded compensation.226 Ala. at 627, 148 So. at 310 (citing New River Coal Co. v.Files, 215 Ala. 64, 109 So. 360 (1926) (unexpected release of carbon monoxide caused compensable heart condition), andGoslin-Birmingham Mfg. Co. v. Gantt, 222 Ala. 321,131 So. 905 (1930) (blow to chest resulting in hematoma that led to blood-poisoning death held compensable)).
Since Davis, the appellate courts of this state have considered only one other case in which the claimant alleged that a cardiac death resulted from a sudden, external, traumatic event. In W.T. Smith Lumber Co. v. Raines,271 Ala. 671, 127 So.2d 619 (1961), the evidence showed that the employee slipped and fell when attempting to crank his tractor, catching all his weight on his left hand and resulting in a fatal coronary thrombosis. The employer defended the case solely on the issue of whether the evidence showing that an accident had occurred was admissible, conceding that if the accident happened, the evidence sufficiently proved that the accident caused the cardiac death. Although no general principle of law may be extracted from this case, the fact that Raines
is the lone reported "accidental" cardiac-injury case since 1933 emphasizes that the settled law governing such injuries, as set out in Davis, is well understood and applied.
In this case, the dependent has claimed throughout this litigation that the employee suffered a cardiac death due to the injuries he sustained in a motor-vehicle accident arising out of and in the course of his employment. The trial court found, in fact, that the injuries the employee had received in the motor-vehicle accident precipitated the employee's cardiac death. Because this case involves an unexpected and unforeseen event causing a cardiac injury, an "accidental" injury within the meaning of Trinity, the trial court did not err in failing to require the dependent to prove that the employment exposed the employee to a danger or risk of cardiac death materially in excess of that to which people are normally exposed in their everyday lives.
 III.
The employer next asserts that the trial court erred in failing to require the dependent to prove her case by clear and convincing evidence. Section 25-5-81 (c), Ala. Code 1975, provides:
 "The decision of the court shall be based on a preponderance of the evidence as contained in the record of the hearing, except in cases involving injuries which have resulted from gradual deterioration or cumulative physical stress disorders, which shall be deemed compensable only upon a finding of clear and convincing proof that those injuries arose out of and in the course of the employee's employment."
By its clear language, § 25-5-81(c) applies only to injuries resulting from gradual deterioration or cumulative-physical-stress disorders. In Ex parte USXCorp., 881 So.2d 437 (Ala. 2003), the Supreme Court said:
 "[T]he burden of proof that should apply depends upon whether the injury was caused by a traumatic accident or by a gradual deterioration or cumulative stress. The cause of the injury is a determination for the trial court, just as is the applicable burden of proof. *Page 1110 
Therefore, if the trial court determines that the injury is not caused by gradual deterioration or cumulative stress but rather by a one-time acute trauma, or accident, the proper burden of proof is the preponderance of the evidence."
881 So.2d at 443. This court has further recognized that the burden of proof the claimant must meet in a workers' compensation action depends not upon the nature of the condition at issue, but upon the manner in which that condition was purportedly caused. V.I. Prewett Son, Inc. v.Brown, 896 So.2d 564 (Ala.Civ.App. 2004). Hence, contrary to the employer's assertion, the fact that this case involves a cardiac death does not ipso facto require use of the clear-and-convincing-evidence standard.
In this case, the dependent alleged and offered evidence tending to prove that the motor-vehicle accident, a one-time event, precipitated the sudden cardiac death of the employee. No evidence tended to show that the death resulted from gradual deterioration or cumulative physical stress due to on-the-job activities. The trial court specifically found that the motor-vehicle accident precipitated the employee's sudden cardiac death. Hence, the trial court did not err in failing to apply the clear-and-convincing-evidence standard.
 IV.
The employer finally asserts that the dependent did not present sufficient evidence of medical causation. To establish medical causation, the claimant must show that the accident was, in fact, a contributing cause of the employee's death.Trinity, supra. It is not necessary that the employment-related injury be the sole cause, or the dominant cause, of the death, so long as it was a contributing cause.See Ex parte Valdez, 636 So.2d 401 (Ala. 1994). If the employee suffers from a latent preexisting condition that inevitably will produce injury or death, but the employment acts on the preexisting condition to hasten the appearance of symptoms or accelerate its injurious consequences, the employment will be considered the medical cause of the resulting injury. See, e.g., Taylor v. Mobile Pulley Mach.Works, Inc., 714 So.2d 300 (Ala.Civ.App. 1997). Numerous cases have applied this analysis in finding coverage when occupational strain or exposure contributes to premature heart failure in an employee with a preexisting cardiac condition.See, e.g., Godbold v. Saulsberry, 671 So.2d 80
(Ala.Civ.App. 1994); City of Fort Payne v. Barton,621 So.2d 993 (Ala.Civ.App. 1993); Ex parte Lewis,469 So.2d 599 (Ala. 1985); and City of Muscle Shoals v. Davis,406 So.2d 919 (Ala.Civ.App. 1981).
When an appeal questions the sufficiency of the evidence pertaining to medical causation, this court will review "`the overall substance and effect of the whole of the evidence, when viewed in the full context of all the lay and expert evidence, and not in the witness's use of any magical words or phrases,'" to determine whether the claimant has presented substantial evidence of medical causation. Ex parte Southern EnergyHomes, Inc., 873 So.2d 1116, 1121 (Ala. 2003) (quotingEx parte Price, 555 So.2d 1060, 1061 (Ala. 1989)) (emphasis omitted). "Substantial evidence" is "`evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.'" Trinity, 680 So.2d at 269
(quoting West v. Founders Life Assurance Co. of Fla.,547 So.2d 870, 871 (Ala. 1989), and citing § 12-21-12(d)).
The circumstances of this case show that immediately following the motor-vehicle accident, the employee developed trouble *Page 1111 
breathing. Within 24 hours, doctors discovered an excessively rapid heart beat and diagnosed congestive heart failure. Those conditions abated while the employee was under sedation in the hospital, but they returned upon his discharge. His breathing and fatigue problems worsened while the employee convalesced at home without the occurrence of any intervening causal activity or event. The employee returned to the hospital, where he was admitted with the diagnosis of decompensated congestive heart failure. Two days later, he died after complaining of shortness of breath and left-sided chest pain. The appellate courts of this state have held that a trial court may infer a causal connection from such circumstances. See Files, supra;Davis, supra; Saulsberry, supra; and Lewis,supra.
As for expert evidence, both Dr. Reilly and Dr. Atkinson agreed that the employee had suffered from a preexisting cardiac condition brought on by purely nonoccupational factors. They both agreed that the employee's preexisting cardiac condition would inexorably result in a fatal arrhythmia. However, they disagreed on the crucial point of whether the injuries from the motor-vehicle accident accelerated the inevitable cardiac death of the employee.
The autopsy conducted by Dr. Reilly did not establish any causal connection between the motor-vehicle accident and the employee's death. The autopsy showed no signs of traumatic damage to the heart attributable to the accident. The autopsy further revealed no signs of lesions, hemorrhage, plaque or blood-vessel ruptures, or adrenaline changes. Dr. Atkinson testified that if trauma or pain from trauma caused a cardiac death, the heart would exhibit such injuries on postmortem examination. Dr. Reilly testified that such injuries may be found commonly in autopsies, but that they did not necessarily appear in all cases. She further testified that Lasix is designed to prevent plaque ruptures, which would explain their absence on the employee's postmortem examination. Although the presence of these anatomical changes would have definitively proven a causal connection, Dr. Reilly said that on the basis of their absence "you cannot rule in or out anything."
Dr. Atkinson maintained that pain is not a known factor that can trigger congestive heart failure. Dr. Reilly disagreed and cited a well-recognized medical treatise to support her contention that pain may cause compensated congestive heart failure to become decompensated. The emergency-room doctor who admitted the employee to UAB on May 24, 2003, also attributed the employee's decompensated congestive heart failure to trauma.
Dr. Atkinson further testified that the delay between the accident and the death negated any causal connection. He opined that if pain from trauma triggered a fatal arrhythmia, the employee would have died shortly after the accident, not 19 days later. Dr. Reilly explained this delay. She opined that the employee showed signs of decompensated congestive heart failure within 24 hours of the accident. In her opinion, the administration of morphine sulfate during his hospital stay controlled his decompensated congestive heart failure. Once the administration of the morphine sulfate ceased, the employee returned to a state of decompensated congestive heart failure exhibited by his shortness of breath and fatigue. He returned for treatment, but the treatment did not successively prevent his death because his decompensated congestive heart failure ultimately caused a fatal arrhythmia. Dr. Atkinson did not refute the scientific basis for any of these opinions.
Although Dr. Reilly repeatedly states that she could not be absolutely sure of *Page 1112 
her opinion and that it only "seem[ed]" to her that the accident precipitated the sudden cardiac death of the employee, the substantial-evidence rule does not require absolute certainty or the use of any particular definite language. Rather, the rule requires that the expert testimony, when coupled with the circumstantial evidence and lay testimony, be of such weight and quality that a fair-minded person, in the exercise of impartial judgment, could infer the fact sought to be proved. See Trinity, 680 So.2d at 271 ("In the context of certain injuries or diseases, the origin of which in general can be scientifically linked to certain strong risk factors or to certain stimuli but the origin of which as to any one person cannot be scientifically determined with certainty, medical evidence of causation in a workers' compensation case, whether in the form of testimony or treatise excerpts, need only show that the work-related risk could have been a precipitating factor in bringing about the onset of the disease."). A fair-minded person exercising impartial judgment could have accepted Dr. Reilly's reasoning, like the trial court did, as an adequate explanation for how the motor-vehicle accident precipitated the sudden cardiac death of the employee.
That is not to say that the employer failed to present substantial evidence that the motor-vehicle accident did not contribute to the sudden cardiac death of the employee. The testimony of Dr. Atkinson, and, to some extent, the cross-examination of Dr. Reilly, produced evidence indicating that the pain and trauma from the motor-vehicle accident was not a likely contributing cause to the employee's sudden cardiac death, but, instead, that the sudden cardiac death had resulted solely from nonoccupational risk factors. It is the duty of the trial court to resolve contradictory evidence, however, and this court is bound by any finding of fact that is supported by substantial evidence. Edwards v. Jesse Stutts,Inc., 655 So.2d 1012 (Ala.Civ.App. 1995).
In this case, substantial evidence supports the trial court's finding that the motor-vehicle accident precipitated the sudden cardiac death of the employee. Because Alabama law does not require any greater proof of medical causation, we are compelled to affirm.
AFFIRMED.
All the judges concur.