MOORE, Judge.
 

 Waters Brothers Contractors, Inc. (“the employer”), appeals from a judgment entered by the Lawrence Circuit Court (“the trial court”) awarding George Wimberley (“the employee”) permanent-total-disability benefits. We affirm.
 

 Procedural History
 

 On February 23, 2005, the employee filed a verified complaint seeking workers’ compensation benefits on account of an injury to his left shoulder allegedly caused by an accident arising out of and in the course of his employment with the employer on February 22, 2002. The employer answered the complaint on April 4, 2005, denying liability for the employee’s injury.
 
 [1]
 
 The case proceeded to trial on April 3, 2006. On February 19, 2008, the trial court entered its final judgment, which contains the required findings of fact and conclusions of law.
 
 See
 
 Ala. Code 1975, § 25-5-88. Among other things, the trial court found that the employee had sustained a severe injury to his left shoulder when a 100-pound object fell on him while working. The trial court further determined that the left-shoulder injury had been surgically treated twice but that the employee continued to have pain and limitations associated with the injury. According to the trial court, the pain and limitations from the injury rendered the employee permanently and totally disabled. The employer filed a postjudgment motion on March 19, 2008. The trial court partially granted the postjudgment motion on May 7, 2008. The employer timely filed its notice of appeal on June 18, 2008.
 

 Facts
 

 The employee testified that, before his work-related accident, he did not have any problems with his left shoulder,
 
 [2]
 
 and the evidence indicates that, before the accident, he was working normally as a heavy-equipment mechanic. On February 22, 2002, while the employee was sitting on his knees beneath a large earthmoving machine attempting to remove a 100- to 120-pound “belly pan,” the pan unexpectedly fell and struck the top part of the employee’s left shoulder directly above the rotator cuff. The employee reported the accident
 
 *128
 
 to his supervisor, but he continued to work for the next few days. After the employee complained that his shoulder seemed to be worsening, the employer, on March 5, 2002, sent him to the Occupational Health Group where he was treated by Dr. McMurry. Dr. McMurry recorded that the employee complained of pain in his left shoulder extending down his left arm into his left hand, difficulty sleeping, and difficulty raising his arm above shoulder level. According to his records, Dr. McMurry initially diagnosed a left-shoulder contusion, but, after the employee continued to have pain, popping, and restricted motion in his left shoulder during follow-up visits, Dr. McMurry suspected that the employee may have developed impingement syndrome or a torn rotator cuff. Therefore, on March 19, 2002, Dr. McMurry referred the employee to Dr. Louis Horn, an orthopedic surgeon.
 

 Dr. Horn examined the employee on March 20, 2002. After considering the employee’s subjective complaints and finding limited motion in the joint, Dr. Horn ordered a magnetic resonance imaging (“MRI”) scan, which the employee underwent on March 22, 2002. According to Dr. Horn, the MRI scan showed
 

 “tendonosis and tenopathy of the rotator cuff with thinning and degeneration of the supraspinatus tendon, but no clear full thickness tear. There is [acromio-clavicular] joint arthrosis with under surface osteophyte formation and impingement. Also, there is detachment of the glenoid labrum anteriorly to the 4 o’clock position with some early osteoarthritis of the glenohumeral joint and sy-novitis.”
 

 As to the cause of those abnormalities, Dr. Horn stated in his notes:
 

 “In talking to [the employee] it is clear that even though there was some preexisting problems with his shoulder, he was totally asymptomatic until the time of his injury on 2/22. My feeling is that most likely the rotator cuff was impinged at that time and this impingement/inflammation and partial tear pathology has continued since then. It is very likely that the glenoid labrum was damaged at the same time and accounts for this finding on the MRI.”
 

 Dr. Horn recommended surgery to repair the damage.
 

 On April 25, 2002, Dr. Horn performed the surgery, which consisted of an arthroscopic examination and “removal of multiple loose bodies” in the left shoulder, “[e]xtensive synovial and glenoid labral de-bridement intra-articularly with surface debridement of glenoid articular cartilage,” a “[sjubacromial decompression,” a bursectomy, and the “[ejxcision of [the] distal clavicle.” The employee testified that the surgery seemed to help for a little while but that he eventually developed pain and stiffness in the shoulder, especially when he would lay on the shoulder while sleeping. Despite those symptoms, the employee returned to work full time in “the shop” in July 2002, still performing mechanic work. The employee saw Dr. Horn several times after returning to work until the doctor released him, with instructions to return to Dr. Horn as needed, on October 23, 2002. At that time, Dr. Horn recorded that the employee continued to be bothered by left-shoulder pain. Dr. Horn attributed that pain to synovitis related to the articular-cartilage problem, which the doctor believed would get worse over time “based on what we found in there” and “particularly with regard to strenuous work.”
 

 On February 6, 2003, the employee returned to Dr. Horn with increasing pain and stiffness in his left shoulder. After noting that the employee was engaging in vigorous activities involving heavy lifting
 
 *129
 
 with his shoulder at work, Dr. Horn stated that he expected the employee to have continual problems that would likely worsen. The doctor recommended that the employee retire if that option was available. The employee testified that the employer did not have a retirement program for which he was qualified.
 

 The employee continued to work and returned to Dr. Horn on July 2, 2004, complaining of pain in the base of his neck and in his shoulder, along with a tingling sensation down his left arm following a lifting incident in June. After taking a history from the employee, and reviewing another MRI scan, Dr. Horn diagnosed the employee with cervical spondylosis and tendonitis of the left shoulder. Dr. Horn described the tendonitis as a residual problem from the 2002 shoulder injury, which he believed the employee had reinjured. Dr. Horn stated that the employee’s work did not seem compatible with his physical capacities. To avoid stressful conditions that could cause further reinjury, Dr. Horn imposed work restrictions of no lifting over 20 pounds and no repetitive use of the left arm.
 

 The employee testified that Dr. Horn’s postsurgical treatment, consisting mainly of steroidal injections, did not provide him any lasting relief. The employee stated that the shoulder continued to lock up, that he could not raise his left arm over chest height, and that he could not sleep at night. Upon his request, the employer’s workers’ compensation adjuster referred the employee to another orthopedic surgeon, Dr. Richard Meyer, who first saw the employee on December 6, 2004.
 

 Dr. Meyer took a subjective history from the employee, examined his upper extremities, and reviewed the prior diagnostic studies. Based on the information he gathered, Dr. Meyer diagnosed the employee with degenerative arthritis, cervical stenosis, thoracic-outlet syndrome, and gout, a disease in which uric acid crystals deposit in the joint causing pain and destruction of the joint. Dr. Meyer recommended an arthrogram and electrical studies. The doctor indicated in his notes that whether the employee could return to his occupation “remains to be seen and that is probably unreasonable.” However, the doctor noted that he believed that “the majority of this is due to gout and just degenerative changes in [the employee’s] shoulder.” The doctor released the employee to return to work with limitations against lifting over 10 pounds or lifting anything above chest height. The employee testified that he took those restrictions back to the employer, but, as the trial court found, the employee was not allowed to return to work at that time.
 

 Dr. Meyer testified that an arthrogram revealed “[b]asically gout with degenerative labrum tear and some inflammation around the shoulder and a lot of arthritis.” The electrical studies showed some evidence of compression of the nerves running through the neck and down the left arm. Dr. Meyer dictated in his notes that he suspected that thoracic-outlet syndrome was responsible for half the nerve problem and that the arthritis was responsible for a portion of it. The doctor recommended a thoracic-outlet release and another arthroscopic procedure to the shoulder. On May 3, 2005, Dr. Meyer performed the recommended surgery, which was designed to remove scar tissue in the shoulder that was placing pressure on the ulnar nerves.
 

 According to the medical records, the employee reported to Dr. Meyer on June 6, 2005, that the surgery had relieved a lot of the pain he was having before. Dr. Meyer recorded that the employee stated that he could use his left arm and raise it overhead without his hand going numb as before, but, at trial, the employee denied
 
 *130
 
 that he had ever been able to lift his arm over his head without pain since the 2005 surgery. The employee also testified that the second surgery and his follow-up physical therapy had relieved some of his symptoms but that he did not receive any long-lasting improvement. On August 4, 2005, Dr. Meyer noted that the employee had improved but that he still complained of pain in his left shoulder with motion. The doctor dictated in his notes that he did not believe the pain would improve due to the employee’s arthritis, gout, and surgery. Dr. Meyer ordered a functional-capacity evaluation (“FCE”); however, the doctor later canceled the FCE and assigned the employee a 15-pound lifting restriction with no overhead activity as to the left arm.
 
 [3]
 
 The doctor subsequently modified the restrictions to 20-pound lifting to chest height and nothing overhead. The employee reached maximum medical improvement on August 12, 2005. Dr. Meyer assigned an 18% permanent-impairment rating to the left upper extremity.
 

 In July 2005, the employee applied for Social Security disability benefits. The employee testified that he had decided to retire before reaching maximum medical improvement and being released by Dr. Meyer. The employer terminated the employee’s employment on September 7, 2005, because of its inability to accommodate the employee’s permanent work restrictions. The employee has not applied for work since being discharged. The employee’s claim for Social Security disability benefits was eventually approved days before the trial, and he received benefits dating back to July 2005.
 

 The parties deposed Dr. Meyer on March 15, 2006. The doctor stated that he had reviewed Dr. Horn’s records and concluded that, before the 2002 accident, the employee had been working normally as a heavy-equipment mechanic but that, after-wards, the employee had developed severe pain indicating that the accident had contributed to the overall condition of the shoulder. Dr. Meyer testified that the 2002 accident may have aggravated the employee’s acromioclavicular (“AC”) arthritis, but not his gout or degenerative arthritis. Dr. Meyer stated that Dr. Horn’s reference to loose bodies in the 2002 surgical note indicated degenerative disease that had been in the shoulder for a long time, which “probably” was not related to the 2002 accident. According to Dr. Meyer, the debridement of the labrum and glenoid articular surface in the 2002 surgery was to repair degenerative tears that would be more consistent with gout and osteoarthritis. The subacromial decompression and excision of the AC joint removed bone spurs and a joint that, according to Dr. Meyer, had more than likely been aggravated by the trauma from the 2002 accident.
 

 As for the gout, cervical stenosis, and the degenerative arthritis that he diagnosed in December 2004, Dr. Meyer testified that those conditions were not related to the employee’s 2002 injury; he testified that only the thoracic-outlet syndrome that he had diagnosed related to the 2002 injury. Dr. Meyer explained that the 2002 blunt trauma to the shoulder had caused subsequent scarring that compressed the nerves in the area. Due to the residual problems from the thoracic-outlet syndrome, the employee could perform over
 
 *131
 
 head activity only occasionally, but he had no other permanent limitations; however, Dr. Meyer also testified that the 20-pound lifting restriction he had assigned in 2004 related to a condition to which the 2002 accident at least contributed. The doctor also stated that he did not believe the employee could return to work as a heavy-equipment mechanic because the shoulder joint was “worn out.” The doctor testified that his 18% permanent-impairment rating included the previous surgery as well as the thoracic-outlet syndrome, which accounted for 5% to 7% of the rating.
 

 Dr. Meyer testified that on his last visit the employee had still complained of limited range of motion and pain in the left shoulder. Dr. Meyer said that some people with a compressed-nerve injury get total pain relief from that condition following the surgery he had performed but that others do not. The doctor opined that the majority of those problems related to the employee’s arthritis and gout. The employee’s family medical records showed that, although the employee had been diagnosed with and treated for gout before his 2002 accident, he had never received treatment for gout in his left shoulder.
 

 At trial, the employee, whom the trial coui't specifically found to be a credible witness, testified that he could still not pick up anything weighing over 5 or 10 pounds and that he still had a sharp, stabbing pain in his shoulder. He stated that, although sometimes the pain is absent, it is generally continual, and that he rated the pain as being 5 on a scale of 10, which increases to 8 out of 10 with movement, long-term use, or pressure. The employee has not taken prescription pain medication for his shoulder problem since shortly after his 2005 surgery, but he takes Advil brand pain reliever and rests his shoulder on a pillow while he sits in a recliner five to seven hours per day to relieve his pain. He still cannot sleep uninterrupted throughout the night, averaging four or five hours of sleep at a time, and he moves from his bed to a recliner for comfort. He can lift his left arm to only about chest height, he cannot push or pull with his left arm, and he cannot climb. Due to these limitations, the employee cannot perform routine yard work, automobile maintenance, or his customary recreational activities, such as hunting, fishing, and playing ball. In addition, the employee has trouble getting dressed, showering, bathing, shaving, and combing his hair. The employee testified that he has not been able to work since he was laid off by the employer. The employee stated that did not know of any type of work he could perform.
 

 Patsy Bramlett testified as a vocational expert for the employee. Bramlett stated that she had met with and tested the employee on October 24, 2005, and had issued a written vocational evaluation on February 14, 2006. She had since reviewed Dr. Meyer’s deposition, which she testified did not change her opinions contained in that evaluation. Bramlett opined that because of his being 62 years old, his relevant past work history as a heavy-equipment mechanic, his reading, spelling, and mathematic comprehension levels, and the permanent limitations assigned by Dr. Meyer and Dr. Horn, the employee cannot return to his usual customary occupation. Bramlett further opined that the employee had no transferable skills to jobs within his functional capacity and that the employee’s potential to be hired for other gainful employment would be poor in the competitive labor market. Bramlett assigned the employee a 100% vocational-disability rating. On cross-examination, Bramlett admitted that, if the 2002 injury had resulted in only a permanent restriction of occasional overhead work with the left arm, the employee would be able to perform some work, but
 
 *132
 
 she doubted that he would be hired because of his age and lack of transferable skills.
 

 Thomas Elliot testified as a vocational expert for the employer. Elliot issued two reports relating to his October 6, 2005, evaluation of the employee — one on October 10, 2005, and one on March 28, 2006. Before receiving Dr. Meyer’s deposition, Elliot determined that the employee had sustained a 58% vocational disability as a result of his 2002 injury. After reviewing Dr. Meyer’s deposition, Elliot believed that the only permanent restriction relating to the 2002 injury limits the employee to occasional overhead work with the left arm. Elliot stated that, based on that restriction, the employee had sustained only a 30% vocational disability as a result of his 2002 injury because he remains capable of working a variety of light-duty jobs.
 

 Analysis
 

 In determining the extent of an employee’s disability for workers’ compensation purposes, a trial court must consider the effect of the work-related injury on the employee’s ability to earn.
 
 See Dolgencorp, Inc. v. Hudson,
 
 924 So.2d 727, 734 (Ala.Civ.App.2005). However, a trial court may not consider the effect of adverse health conditions or symptoms not satisfactorily proven to be medically caused by the claimed accident.
 
 See, e.g., United Defense, L.P. v. Willingham,
 
 829 So.2d 771, 773 (Ala.Civ.App.2002) (remanding case to trial court to reconsider disability rating because of failure of worker to prove by clear and convincing evidence that carpal tunnel syndrome and fibro-myalgia were work-related);
 
 Bess v. Waffle House, Inc.,
 
 824 So.2d 783, 787 (Ala.Civ.App.2001) (affirming award of permanent-partial-disability benefits when evidence demonstrated that worker’s soft-tissue pain, depression, and sleep disorder that increased disability bore no causal relation to work-related accident);
 
 Goodyear Tire & Rubber Co. v. Correll,
 
 736 So.2d 624, 629 (Ala.Civ.App.1999) (absent evidence that alleged work-related accident medically caused Chiari malformation and syringomyelia, trial court erred in awarding permanent-total-disability benefits based in part on the effect of those injui'ies);
 
 Cooper v. Seven Rivers, Inc.,
 
 688 So.2d 883, 885-86 (Ala.Civ.App.1997) (holding that, when trial court found that worker did not develop polymyositis as result of her fall, it properly disregarded disability resulting from that condition when assessing compensable disability rating); and
 
 Grumm v. Neptune Meter Co.,
 
 472 So.2d 1067, 1068 (Ala.Civ.App.1985) (affirming 15% permanent-partial-disability award on ground that trial court properly excluded disability from neuropathic condition not proven to be medically caused by work-related back strain). In this case, the employer argues that the trial court’s judgment should be reversed because, it says, in finding the employee permanently and totally disabled, the trial court erroneously relied on the pain and limitations caused by the employee’s gout, degenerative arthritis, and cervical problems, which the compensable 2002 work-related accident did not medically cause.
 

 Initially, we disagree with the employer that the trial court considered the employee’s gout and cervical problems in making its disability determination. After closely reviewing the final judgment, we find that the trial court discusses the employee’s arthritic conditions and thoracic-outlet syndrome in great detail but does not mention the employee’s gout or cervical problems at all. Moreover, although the trial court includes in its findings the expert opinions linking the arthritic conditions and the thoracic-outlet syndrome to
 
 *133
 
 the 2002 accident, the trial court omits Dr. Meyer’s opinion that the 2002 accident did not medically cause the employee’s gout or cervical problems. The trial court’s findings in a workers’ compensation case should be construed so as to uphold the judgment rather than to require reversal.
 
 See James River Corp. v. Franklin,
 
 840 So.2d 164, 171 (Ala.Civ.App.2002) (citing
 
 Avery Freight Lines v. Persons,
 
 250 Ala. 40, 32 So.2d 886 (1947)). Accordingly, because we construe the judgment as excluding any consideration of the gout and cervical problems, we will not discuss those conditions further.
 

 Based on Dr. Meyer’s deposition testimony, the employer maintains that the 2002 accident did not aggravate the employee’s degenerative arthritis. Discounting any limitations arising from that condition, the employer argues, the employee has no physical restrictions relating to the 2002 accident other than occasional overhead use of the left arm, which, as Elliot testified, renders him only permanently partially disabled.
 

 Although Dr. Meyer was the only expert witness to testify regarding medical causation, the trial court was not bound to accept his testimony.
 
 Fowler v. Employers Choice,
 
 658 So.2d 452, 453 (Ala.Civ. App.1994). In determining medical causation, the trial court must consider the totality of the evidence, including the circumstantial evidence, lay testimony, and medical records.
 
 Ex parte Price,
 
 555 So.2d 1060 (Ala.1989). “It is in the overall substance and effect of the whole of the evidence, when viewed in the full context of all the lay
 
 and
 
 expert evidence, and not in the witness’s use of any magical words or phrases, that the test finds its application.” Price, 555 So.2d at 1063.
 

 In his medical notes, Dr. Horn stated that the employee had asymptomatic preexisting problems with the shoulder but that the 2002 accident had damaged the employee’s glenoid labrum, which had become detached according to the 2002 MRI scan, and had impinged the employee’s rotator cuff. After the 2002 surgery, the employee complained of continued left-shoulder pain, which Dr. Horn attributed to synovitis from the glenoid articular-cartilage damage. Dr. Horn opined as early as October 2002 that he expected that problem to worsen with time and because of the routine heavy work the employee performed. Dr. Horn also believed that the employee would not be able to perform his occupation because of that condition. In 2004, Dr. Horn stated that the employee had developed left-shoulder tendonitis as a residual condition of his 2002 injury. To avoid further reinjury, the doctor assigned the employee permanent work restrictions of no lifting over 20 pounds and no repetitive use of the left arm.
 

 The circumstantial evidence indicates that, before 2002, the employee was using his left shoulder normally as a heavy-equipment mechanic with little or no problems. Immediately following the 2002 accident, the employee developed severe pain and limitations in his left shoulder. Medical and surgical treatment temporarily resolved some of his pain and limitations, but, with ordinary use of the shoulder, the original symptoms returned. Those symptoms have persisted ever since, as documented in the employee’s medical records and in his credible trial testimony.
 

 In addition, we do not find Dr. Meyer’s opinions to be as absolute as the employer contends. Dr. Meyer testified that the 2002 accident had contributed to the overall condition of the shoulder. Dr. Meyer also said that the 20-pound lifting restriction he had assigned related to a shoulder condition to which the 2002 accident had at least contributed. He also stated that he did not believe that the employee could
 
 *134
 
 return to work as a heavy-equipment mechanic because the shoulder joint was “worn out.” In his August 2005 notes, Dr. Meyer dictated that he expected the employee to continue to have left-shoulder pain due, in part, to his surgery, which indisputably was for a work-related condition.
 

 At the trial-court level, to establish medical causation, the employee must show, through a preponderance of the evidence,
 
 [4]
 
 that the accident arising out of and in the course of the employment was, in fact, a contributing cause of the claimed injury.
 
 Ex parte Trinity Indus., Inc.,
 
 680 So.2d 262, 266 (Ala.1996).
 

 “It is not necessary that the employment-related injury be the sole cause, or the dominant cause, of the death, so long as it was a contributing cause.
 
 See Ex parte Valdez,
 
 636 So.2d 401 (Ala.1994). If the employee suffers from a latent preexisting condition that inevitably will produce injury or death, but the employment acts on the preexisting condition to hasten the appearance of symptoms or accelerate its injurious consequences, the employment will be considered the medical cause of the resulting injury.”
 

 Associated Grocers of the South, Inc. v. Goodwin,
 
 965 So.2d 1102, 1110 (Ala.Civ. App.2007).
 

 The trial court has wide discretion in reaching its findings regarding medical causation.
 
 Ex parte USX Corp.,
 
 881 So.2d 437, 442 (Ala.2003). It may interpret the evidence according to its own best judgment.
 
 3-M Co. v. Myers,
 
 692 So.2d 134, 137 (Ala.Civ.App.1997). A trial court may infer medical causation from circumstantial evidence indicating that, before the accident, the worker was working normally with no disabling symptoms but that, immediately afterwards, those symptoms appeared and have persisted ever since.
 
 See Boise Cascade Corp. v. Jackson,
 
 997 So.2d 1042, 1047 (Ala.Civ.App.2008) (citing
 
 Alamo v. PCH Hotels & Resorts, Inc.,
 
 987 So.2d 598, 603 (Ala.Civ.App.2007) (Moore, J., concurring specially)).
 

 On appeal, a trial court’s findings of fact based on conflicting evidence are conclusive on this court if they are supported by substantial evidence.
 
 Landers v. Lowe’s Home Ctrs., Inc.,
 
 14 So.3d 144, 147 (Ala.Civ.App.2007) (citing
 
 Edwards v. Jesse Stutts, Inc.,
 
 655 So.2d 1012 (Ala.Civ.App.1995)).
 
 See also
 
 Ala.Code 1975, § 25-5 — 81(e)(2); and
 
 Ex parte Southern Energy Homes, Inc.,
 
 873 So.2d 1116, 1122 (Ala. 2003). “Substantial evidence” is “ ‘evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the exis
 
 *135
 
 tence of the fact sought to be proved.’ ”
 
 Ex parte Trinity Indus., Inc.,
 
 680 So.2d at 268 (quoting
 
 West v. Founders Life Assurance Co. of Florida,
 
 547 So.2d 870, 871 (Ala.1989)). In making that determination, we may not reweigh the evidence,
 
 id.,
 
 and we must view the overall substance of the evidence in a light most favorable to the findings of the trial court.
 
 Ex parte Southern Energy Homes,
 
 873 So.2d at 1122.
 

 Based on Dr. Horn’s medical records, some of Dr. Meyer’s deposition testimony, and the circumstantial evidence, we conclude that the record contains substantial evidence indicating that the employee aggravated not only his AC arthritis but also his degenerative arthritis. We also conclude that the employee presented substantial evidence indicating that, due to complications from the 2002 work-related injury, he had been permanently restricted to lifting no more than 20 pounds with his left arm and no repetitive use of the left arm, in addition to Dr. Meyer’s restrictions. That evidence conflicts with the majority of Dr. Meyer’s deposition testimony, but we note that the trial court’s findings based on conflicting evidence are conclusive if supported by substantial evidence.
 
 Edwards v. Jesse Stutts, Inc.,
 
 655 So.2d 1012, 1014 (Ala.Civ.App.1995). Although we may not have necessarily made the same medical-causation findings, we may not substitute our judgment for that of the trial court.
 
 See Ex parte Staggs,
 
 825 So.2d 820, 822 (Ala.2001).
 

 After resolving the conflicts in the evidence regarding medical causation, the trial court reasonably could have determined that the employee was permanently and totally disabled. Permanent total disability is defined as “any physical injury ... resulting from an accident, which injury ... permanently and totally incapacitates the employee from working at and being retrained for gainful employment.”
 
 [5]
 
 Ala. Code 1975, § 25-5-57(a)(4)d. The employee testified that, because of the pain and limitations from his shoulder, he could not return to his former occupation or perform any other type of work. Bramlett testified that, based on the permanent restrictions related to the compensable injuries, as well as the employee’s age, intellect, work history, and other relevant factors, the employee was 100% vocationally disabled.
 

 We recognize that the employee worked for a substantial amount of time following the 2002 accident. However, Alabama law has long recognized that the mere fact that a worker resumes work following a work-related accident does not necessarily disentitle the worker to compensation.
 
 Agricola Furnace Co. v. Smith,
 
 239 Ala. 488, 492, 195 So. 743, 746 (1940). If the work-related injury does not immediately disable the worker, but slowly and insidiously progresses, allowing the worker to work for some time until finally succumbing, that period of employment does not in any way diminish the ultimate disability.
 
 See, e.g., Pemco Aeroplex, Inc. v. Moore,
 
 775 So.2d 215, 217-18 (Ala.Civ.App.1999) (affirming award of permanent-disability benefits based on evidence that worker attempted to work as mechanic for two months following injury, but job duties exceeded his restrictions so he was forced to quit);
 
 Hudson Indus. v. Harrell,
 
 484 So.2d 1099 (Ala.Civ.App.1986) (holding that truck driver who returned to work at same wages for a period, but who subsequently underwent spinal surgery, could recover permanent-disability benefits);
 
 *136
 

 Federal Mogul Corp. v. Moses,
 
 341 So.2d 162, 165 (Ala.Civ.App.1976) (affirming permanent-disability finding based on evidence indicating that worker had worked only 6 weeks out of 15-month period since accident).
 

 In this case, substantial evidence indicates that the employee returned to work in the shop in July 2002. By October 2002, Dr. Horn had noted that he expected the employee’s shoulder pain and limitations to worsen as he continued working. As predicted, the shoulder deteriorated to the point that, in February 2003, Dr. Horn recommended that the employee retire and, in July 2004, placed permanent restrictions on the employee’s use of the left upper extremity to prevent further injury. After receiving those permanent restrictions, the employee actually worked only another five months.
 
 [6]
 
 The employee then underwent another surgery in May 2005, after which the employer informed him that it had no work available within his residual physical capacities. Based on that evidence, the trial court reasonably could have determined that the employee had sustained a permanent total disability despite having worked from July 2002 to December 2004.
 

 The employer last maintains that the employee should be disqualified from recovering compensation because he voluntarily withdrew from the labor market without good reason.
 
 See
 
 1 Terry A. Moore,
 
 Alabama Workers' Compensation
 
 § 13:34 (1998) (“An employee who declines to reenter the labor market following a work-related injury for no good reason cannot trace the lack of employment to the work-related injury, but solely to his or her voluntary decision not to work.”);
 
 see also Black v. Alabama Dry Dock & Shipbuilding Co.,
 
 249 Ala. 209, 30 So.2d 456 (1947) (holding that, although worker was unemployed for 17 months following injury, he could not receive compensation because evidence indicated that injury did not prevent worker from working but that he decided to quit working solely to gather crops). We reject that argument.
 

 The record discloses that, by the time the employee underwent his last surgery, Dr. Meyer had already dictated in his notes that he did not expect the employee to return to working as a heavy-equipment mechanic because of his shoulder problems. While the employee was convalescing from his thoracic-outlet-release surgery, but before reaching maximum medical improvement, the employee applied for Social Security disability benefits; however, the record contains no evidence indicating that the employee had resigned his position with the employer. Rather, after the employee reached maximum medical improvement in August 2005, the employer notified him that he had been discharged. Thereafter, the employee did not search for work; however, as the employee testified, he did not believe that he could work with his pain and restrictions. Bramlett basically testified that any search would have been futile because the employee was not likely to find employment with his vocational profile. Based on that evidence, the trial court reasonably could have concluded that the employee did not voluntarily withdraw from the labor market without good reason but that his work-related injury had led the employee to lose his employment.
 

 For the foregoing reasons, we conclude that the trial court did not err in finding
 
 *137
 
 that the 2002 work-related accident caused the employee injuries to his left shoulder that resulted in his permanent and total disability. Therefore, we affirm the judgment.
 

 AFFIRMED.
 

 THOMPSON, P.J., and PITTMAN, BRYAN, and THOMAS, JJ., concur.
 

 [1]
 

 . The employer also asserted that the statute of limitations barred the claim; however, the trial court impliedly denied that claim by awarding compensation. The employer does not raise any argument that the trial court erred in that regard.
 

 [2]
 

 . A medical record indicates that the employee informed his physician on December 6, 2004, that he had had prior symptoms in his left shoulder, but nothing significant.
 

 [3]
 

 . In his notes, Dr. Meyer dictated that the employee’s cardiologist had assigned him those restrictions before the scheduled FCE; Dr. Meyer had simply concurred with those restrictions and canceled the FCE. However, the record contains a letter from the cardiologist stating that she had not assigned any restrictions and that the restrictions assigned by Dr. Meyer were not necessary for the employee's cardiac condition.
 

 [4]
 

 . In its reply brief, the employer argues that the employee bore the burden of proving medical causation by clear and convincing evidence because the employee attempted to prove that his degenerative conditions were caused by repetitive heavy-lifting activities at work.
 
 See
 
 Ala.Code 1975, § 25-5-81(c);
 
 see also Valtex, Inc. v. Brown,
 
 897 So.2d 332, 334 (Ala.Civ.App.2004) (requiring proof by clear and convincing evidence that an injury is caused by cumulative physical stress from work activities). We reject that argument for several reasons. First, the employee claimed only that his shoulder injury resulted from the 2002 accident; he did not make any claim regarding a gradual or cumulative injury. Second, the employer did not make any argument at the trial-court level that the clear- and-convincing-evidence standard applied.
 
 See Brown v. Wal-Mart Stores, Inc.,
 
 864 So.2d 1100, 1104 (Ala.Civ.App.2002) (holding that appellant waives issue by failing to first raise it before the trial court). Third, this court may not consider arguments raised for the first time in a reply brief.
 
 See Saad's Healthcare Servs., Inc. v. Meinhardt,
 
 19 So.3d 847, 857 (Ala.Civ.App.2007), aff'd,
 
 Ex parte Saad's Healthcare Servs., Inc.,
 
 19 So.3d 862 (Ala.2008).
 

 [5]
 

 . The employer asserts only that the employee is capable of working at other gainful employment. The employer does not raise any issue regarding the trial court's implied finding that the employee is incapable of being retrained for gainful employment.
 

 [6]
 

 ,
 
 The employer maintains that the employee worked until September 7, 2005, but the evidence indicates that he last worked on December 6, 2004, as the trial court found. The employer formally terminated the employee by letter dated September 7, 2005.