BRYAN, Judge.
W.A. Kendall & Company, Inc. (“W.A. Kendall”), appeals from a judgment awarding Benjamin Dean Madison workers’ compensation benefits.[1] We reverse and remand.
In its judgment, the trial court made extensive findings of fact, some of which we now recite:
“[W.A. Kendall hired Madison] as a bucket operator and tree climber.
“... [Madison’s] job duties with [W.A. Kendall] required him to climb, cut and clear trees and brush at job sites where [W.A. Kendall] was hired to work. [Madison] testified that it was very common to get scratches, cuts and[ ] scrapes on his arms while doing this type of work.
“.... Beginning in September, 2005, Madison worked for [W.A. Kendall] in ... Texas cleaning up fallen trees [after *437 Hurricane Katrina had made landfall]. [Madison] testified that the living conditions for this job were often primitive, camping out in two-man tents at an abandoned schoolhouse while bathing in creeks and ponds as there was no electricity or running water for several weeks. ...
“.... [Madison] testified that not long after he started work in Texas, while still living in tents, he became ill and noticed he had two boils under his left arm[, ie., in the area of his left armpit]. He informed a supervisor named Billy McCollum. On September 26, 2005, Madison was taken by Mr. McCollum to Memorial Hermann Baptist Hospital in Beaumont, Texas for treatment. The boils were lanced, he was given a shot[,] and [he] then returned to work. [W.A. Kendall] did not pay for this medical care to [Madison].”
Madison testified that, after the left-armpit boils were lanced, he did not experience a recurrence of boils in that area. Madison continued to work his normal job in Texas during the fall of 2005. In early December 2005, Madison returned to Alabama, where he continued to work for W.A. Kendall. Madison’s mother, Linda Locke Madison, testified at trial that Madison had a persistent wound on his right wrist when he returned to Alabama. In its judgment, the trial court found that Madison had sustained the right-wrist wound “while working in Texas.”
In mid-December 2005, Madison developed a fever while at work one day. Madison notified his supervisor that he had a fever and that he needed to see a doctor. However, Madison sat in his automobile the remainder of the work day; he did not return to work the following day. Shortly thereafter, on December 15, 2005, Madison’s mother found Madison unconscious. Ms. Madison took Madison to Northwest Medical Center (“NMC”) in Winfield, Alabama, where he was admitted. It was determined that Madison, who was diabetic, was suffering from diabetic ketoacidosis. On December 18, 2005, while at NMC, Madison was diagnosed as having a staph infection in his bloodstream. The trial court found:
“Ms. Madison ... testified that after her son was first admitted to [NMC], she called [W.A. Kendall’s] place of business and notified them that her son was in the hospital and very ill. She spoke with a[n unidentified] female. ... This phone call was on or about December 19, 2005. Ms. Madison testified that neither she nor her son ever heard back from anyone in management or supervisors at [W.A.] Kendall in response to this call.”
During his stay at NMC, Madison continued to have a “nonhealing” wound on his right wrist. The wrist wound was red, swollen, and appeared to be infected. On December 23, 2005, Madison was released from NMC, but he was readmitted to that hospital on December 27, 2005, after experiencing shortness of breath.
Soon after returning to NMC, Madison was diagnosed as having endocarditis of the mitral valve in his heart. On December 28, 2005, Madison was transferred to the University of Alabama at Birmingham Hospital (“UAB Hospital”). On January 10, 2006, while at UAB Hospital, Madison underwent surgery to replace his infected mitral valve. The trial court found that, while he was “at UAB [Hospital,] ... Madison learned that the staph infection [had led] to [his] endocarditis.” Also while he was at UAB Hospital, Madison had surgery to repair a hole in his esophagus. The trial court noted that Madison later suffered from blurred vision, permanent vision loss, headaches, “mini strokes” occurring in his eyes, congestive heart failure, and kidney damage.
*438 On September 18, 2006, Madison sued W.A. Kendall, seeking workers’ compensation benefits. The complaint alleged that Madison had contracted his staph infection as a result of his employment with W.A. Kendall and that the staph infection had subsequently caused injuries to Madison’s heart, kidneys, and esophagus. W.A. Kendall answered and denied liability. The trial court held a trial on December 9, 2008. At trial, the parties disputed, among other things, whether Madison had given proper notice of his allegedly work-related injuries. On May 26, 2009, the trial court entered a judgment determining that Madison was permanently and totally disabled and awarding him accrued and future permanent-total-disability benefits and accrued and future medical expenses. In its judgment, the trial court indicated that both Madison’s right-wrist injury and the two boils that had been lanced in Texas were “factors of causation” regarding his staph infection. The trial court then found that Madison’s staph infection in turn led to his endocarditis and “several related and permanent medical conditions.” The trial court determined that W.A. Kendall had received proper notice because, the trial court found, W.A. Kendall had received notice of Madison’s boils in September 2005. The trial court found: “[Madison] suffered an on-the-job injury and ... he notified [W.A. Kendall] by verbally informing his supervisors of the boils on his left arm. The Court therefore finds that the notice provisions have been met.” The trial court did not address whether W.A. Kendall received proper notice of Madison’s right-wrist injury. W.A. Kendall timely appealed.
Section 25-5-81(e), Ala.Code 1975, provides the standard of review in workers’ compensation cases:
“(1) In reviewing the standard of proof set forth herein and other legal issues, review by the Court of Civil Appeals shall be without a presumption of correctness.
“(2) In reviewing pure findings of fact, the finding of the circuit court shall not be reversed if that finding is supported by substantial evidence.”
Substantial evidence is “ ‘evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’ ” Ex parte Trinity Indus., Inc., 680 So.2d 262, 268 (Ala.1996) (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989)).
Because Madison sought benefits for injuries allegedly caused by a work-related accident, at trial he bore the burden of establishing the necessary elements of his claim by a preponderance of the evidence. § 25-5-81 (c), Ala.Code 1975.
“ ‘Although “substantial evidence” must be found by the appellate court in order to sustain the trial court’s findings in any workers’ compensation case, it is necessary to take into consideration the nature qf the finding that must be made by the trial court in order to determine what qualifies as “substantial evidence” to support that finding. In a case in which, in order to find for the plaintiff, the trial court is required to find that a given fact has been established by a “preponderance” of the evidence, the evidence is not sufficient to allow appellate affirmance of a judgment based on that finding unless the record contains evidence from which the fact-finder reasonably could have determined that the fact was proven by a preponderance of the evidence.’ ”
Ex parte McInish, 47 So.3d 767, 774 (Ala.2008) (quoting KGS Steel, Inc. v. McInish, *439 47 So.3d 749, 759 (Ala.Civ.App.2006) (Murdock, J., concurring in the result)).
On appeal, W.A. Kendall argues (1) that Madison’s staph infection and resulting complications were not medically caused by his boils but, rather, by his right-wrist wound; and (2) that Madison did not provide W.A. Kendall notice of his right-wrist wound. We first address the medical-causation issue.
“In determining medical causation, the trial court must consider the totality of the evidence, including the circumstantial evidence, lay testimony, and medical records. Ex parte Price, 555 So.2d 1060 (Ala.1989). ‘It is in the. overall substance and effect of the whole of the evidence, when viewed in the full context of all the lay and expert evidence, and not in the witness’s use of any magical words or phrases, that the test finds its application.’ Price, 555 So.2d at 1063.”
Waters Bros. Contractors, Inc. v. Wimberley, 20 So.3d 125, 133 (Ala.Civ.App.2009). To establish medical causation in cases based on an accident, an employee must show that the accident caused or was a contributing cause of the injury. Page v. Cox & Cox, Inc., 892 So.2d 413, 417 (Ala.Civ.App.2004).
W.A. Kendall contends that Madison’s staph infection and resulting complications did not originate with the boils that were lanced while Madison was working in Texas. Therefore, W.A. Kendall argues, whether Madison gave notice of those boils is immaterial to a determination of the compensability of the staph infection and the resulting complications. Medical evidence in the record indicates that a staph infection typically is caused when staph bacteria existing on the skin enters the body through a break in the skin. As noted, Madison’s staph infection was detected on December 18, 2005, while he was at NMC. Dr. James Hatfield treated Madison during his stay at NMC. The trial court cited the following deposition testimony by Dr. Hatfield as evidence that Madison’s boils caused his staph infection:
“Q- [By counsel for Madison:] ... [Madison has] testified while he was in Texas doing this cleanup, some boils appeared on his body.
“A. Okay.
“Q. And that while he was out there, he had to go get medical treatment to have them lanced....
“A. Okay.
“Q. ... With all of that said, do you have an opinion as to how [Madison] acquired the Staph infection that eventually le[d] to these serious medical conditions he was treated for ... ?
[[Image here]]
“A. [T]his story that you’re telling me and this quarantine from ... ‘scabies’ [related by Madison’s] mother may have been ... lost in translation ... from [Madison] to his mother.[2] At any rate, if that’s the infection that he’s talking about, these lances, these abscesses or boils, very well could have been Staph infections at that time. We do. know that we all have Staph infections that live on our skin. Well, abscesses or boils, the risk factors for developing boils or abscesses are poor hygiene, con *440 tusions, abrasions, close contact with other patients with Staph[,] such[] as football teams [and] prisoners. So he certainty has a lot of risk factors for developing Staph infections.”
Dr. Hatfield’s testimony is somewhat ambiguous. For one, he prefaced his answer with a reference to “scabies,” a condition that apparently has no relevance in this case, and he further prefaced his answer with the conditional statement “if that’s the infection that he’s talking about.” Dr. Hatfield testified that the “abscesses,” “boils,” and the “lanc[ing]” of those boils “very well could have been Staph infections.” However, it is unclear whether Dr. Hatfield intended to say whether the “abscesses,” “boils,” and the “lanc[ing]” of those boils were indications of an already existing staph infection or whether they actually caused Madison’s staph infection.
Shortly after providing the testimony quoted above, Dr. Hatfield testified:
“A. ... [W]hether [Madison’s] Staph [infection] came from the skin wound, I don’t know. Maybe the infectious disease specialist and maybe the cardiotho-racic surgeon may have a better idea. But it appears to be in my opinion.
“Q. [By counsel for W.A. Kendall:] Are you able to determine to a reasonable degree of medical certainty [that Madison’s various medical problems] came from the abrasion on the wrist?
[[Image here]]
“A. This ... infection of the skin is just one piece of the perfect disease.”
Therefore, although it is unclear, it appears that Madison’s wrist injury was the “skin wound” that Dr. Hatfield opined apparently caused Madison’s staph infection. This conclusion is supported by earlier testimony by Dr. Hatfield:
“A. ... [When Madison was being-treated at NMC] it was discovered that he had ... a non-healing wound of his right wrist. And this wound become more red and swollen and warm to touch. It looked as if ... it was infected. And so this was a ... possible source for [staph infection].
[[Image here]]
“Q. [By counsel for Madison:].... Did you discuss with any of [the other doctors at NMC] the cause or origin of these symptoms that Mr. Madison was experiencing while [at NMC]?
“A. We ... discussed [it], and it was felt that his ... Staph [infection] could have been and was very likely related to his skin infection.”
Dr. Hatfield’s testimony seems to indicate that Madison’s wrist wound was the likely source of his staph infection. However, regarding whether Madison’s boils that were lanced in Texas caused his staph infection, Dr. Hatfield’s testimony is unclear.
Dr. James Willig, a physician whose practice concentrates on infectious diseases, treated Madison following his mi-tral-valve-replacement surgery. Ms. Madison cites the following testimony by Dr. Willig as evidence that the two boils that Madison developed in Texas caused his staph infection:
“Q. [By counsel for Madison:] ... [I]t’s your opinion that ... from a medical standpoint, the most likely source of the infection was the opening in the wrist?
“A. The opening in the wrist complicated by the subsequent boils and infections there, yes.”
(Emphasis added.) The “boils” referenced by Dr. Willig occurred after Madison sustained a wrist wound and at the location of that wrist wound. The two boils that de *441 veloped in Texas were lanced and resolved in September 2005, apparently before Madison injured his wrist. The two boils that Madison developed in Texas were located in his left armpit, but the boils referenced by Dr. Willig in his testimony were located on Madison’s right wrist. Therefore, the boils mentioned by Dr. Willig as indicating the source of the staph infection were not the two boils that Madison had lanced in Texas.
Dr. Willig’s testimony indicated that he believed that Madison’s wrist injury was the likely source of his staph infection. Dr. Willig further testified:
“Q. [By counsel for Madison:] ... [D]o you have an opinion as to whether or not Mr. Madison’s staph infection was from his workplace exposure and the break in the skin, the boils that developed ... ?
“A. ... The fact that he had an infection, a pus producing infection on his wrist a few weeks before [the staph infection was discovered] and had been undergoing treatment for that, to us it’s almost a smoking gun, if you will, that ... here’s an active site of infection that would have given him entry into the bloodstream.
[[Image here]]
“Q. ... Taking into consideration [Dr. Hatfield’s testimony], does that further confirm to you ... that the most likely scenario medically [is] that it’s from the right wrist where this [staph] infection came from?
[[Image here]]
“A. [Dr. Hatfield] goes as far as to state that it was infected and that it was a possible source of [the staph infection], I think this is pretty much what we’ve mentioned in the past. I mean, if there’s an active infection, it’s just the smoking gun.”
Dr. David McGiffin performed the mi-tral-valve-replacement surgery on Madison at UAB Hospital after he was diagnosed with endocarditis. Dr. McGiffin traced Madison’s endocarditis to his right-wrist wound. Dr. McGiffin testified:
“Q. [By counsel for W.A. Kendall:] Where things get fuzzy from what I understand, Doctor, is the cause of the endocarditis?
[[Image here]]
“A. It’s not fuzzy in my mind.
“Q. And Doctor, what are your opinions as to the cause of the endocarditis?
“A. The overwhelming likelihood is that the infection that he had on the hand[, ie., wrist,] seeded the mitral valve....”
After a careful consideration of the evidence, we conclude that there is not substantial evidence supporting a finding that the two boils that Madison developed in his armpit in Texas medically caused his staph infection and resulting complications. That is, the record does not contain evidence fi*om which the trial court reasonably could have determined, by a preponderance of the evidence, that the boils caused Madison’s staph infection and resulting complications. Ex parte McInish, 47 So.3d at 778. The overwhelming evidence in this case indicates that Madison’s right-wrist wound, not the two boils in his left armpit, caused or contributed to the staph infection and the resulting complications.
As noted, the trial court found that Madison provided proper notice in this case by providing notice of the boils that developed in his left armpit while working in Texas. However, because we conclude that those boils did not medically cause the staph infection and the resulting complications, it follows that notice of those boils is irrelevant with respect to those injuries. W.A. Kendall argues that Madison did not provide proper notice in this *442 case because, W.A. Kendall says, Madison did not provide notice of his right-wrist injury. Although we conclude that there is not substantial evidence demonstrating that Madison’s left-armpit boils caused his staph infection and resulting complications, the trial court found that both Madison’s right-wrist wound and his left-armpit boils were “factors of causation” regarding the staph infection and the resulting complications. The trial court did not determine whether Madison provided proper notice to W.A. Kendall of the right-wrist injury. Whether an employer has received proper notice of an injury is a question of fact to be determined by the trial court. Davis v. Paragon Builders, 652 So.2d 762, 764 (Ala.Civ.App.1994). Accordingly, we reverse the trial court’s judgment insofar as it found that Madison’s left-armpit boils caused his staph infection and resulting complications, and we remand the case for the trial court to make a factual finding regarding whether Madison provided proper notice of his right-wrist injury.
REVERSED AND REMANDED WITH INSTRUCTIONS.
PITTMAN, THOMAS, and MOORE, JJ., concur.
THOMPSON, P.J., concurs in the result, without writing.

. Madison died during the pendency of this appeal. Following the filing of a suggestion of death and a motion to substitute, this court substituted Madison’s dependent son, Ryan Madison, by and through his paternal grandmother and next friend, Linda Locke Madison, as the appellee. See Rule 43, Ala. R.App. P.; and § 25-5-57(a)(5), Ala.Code 1975.

. When Madison was admitted to NMC, because he was not lucid, Ms. Madison provided an account of her son's medical history. At that time, Ms. Madison stated that Madison, while working in Texas, had acquired scabies, a contagious itch or mange caused by mites, see Merriam-Webster's Collegiate Dictionary 1106 (llth ed. 2003), and had consequently been quarantined. This account of scabies and quarantine was not discussed at trial and was not cited by the trial court in its judgment, other than in the above quotation by Dr. Hatfield.